**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| HEATHER SCHROEDER and MISTY TANNER, individually and on behalf of all others similarly situated, | CLASS ACTION |
| Plaintiffs, | Civil Action No.: 1:22-cv-00946-JMS-MPB |
| v. | |
| PROGRESSIVE PALOVERDE INSURANCE COMPANY, and PROGRESIVE SOUTHEASTERN INSURANCE, an Ohio corporation, | |
| Defendants. | |

**PLAINTIFF'S BRIEF IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION**

## I.      INTRODUCTION

This case is one of many virtually identical cases against Progressive that are currently pending in courts around the country. Recently, three courts have addressed virtually identical claims and evidence as are alleged and presented here—and *all three granted class certification* of those identical claims. *See Volino v. Progressive Cas. Ins. Co*., 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023); *Brown v. Progressive Mt. Ins. Co.*, No. 3:21-cv-175-TCB, 2023 U.S. Dist. LEXIS 136472 (N.D. Ga. Aug. 3, 2023); *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 U.S. Dist. LEXIS 140205 (E.D. Pa. Aug. 11, 2023). This Court should follow the well-reasoned analyses from these three courts and similarly grant class certification here of Plaintiff Schroeder's claims against Defendant Progressive Paloverde Insurance Company.[1]

---

[1] Plaintiff Schroeder's policy is underwritten by Progressive Paloverde Insurance Company, and she is seeking certification of a Class comprised of similarly sutured Progressive Paloverde

Under basic appraisal standards, calculating the actual cash value ("ACV") of a vehicle using the comparable or "comp" methodology is done by taking the average price of comparable vehicles, adjusted for observed and verified differences between each respective comparable vehicle and the insured vehicle in mileage, equipment, and condition. Adjustments to the price of comparable vehicles cannot be based on unverified assumptions, to say nothing of purposely discarding and ignoring data that undermines such assumptions. Yet that is precisely what Progressive does in determining its insureds' ACV. In the modern used-auto market, dealers price vehicles to market and list vehicles for sale on the Internet at that market price. Data on millions of transactions confirm this by showing used vehicles typically sell for the listed price. This case exists because Progressive ignored the reality of how the used auto market operates, ignored the empirical data of vehicle transactions, and ignored appraisal standards for calculating the market value of insured vehicles, all in service to a uniform practice of undervaluing totaled vehicles.

It is undisputed that when insureds suffer a total loss to their vehicles, Progressive's form insurance policy ("Policy") requires payment of ACV, less any deductible. Progressive calculates ACV using the comparable or "comp" method, but it makes a critical departure from that otherwise industry-standard methodology: Before making adjustments to comparable vehicles based on verified differences in equipment, condition, and mileage, Progressive reduces the list prices by applying a "Projected Sold Adjustment" ("PSA") of ██████ on average, which it (falsely) represents is the amount consumers can negotiate off the price in a cash transaction. This adjustment—the only line-item adjustment utilized by Progressive that is speculative and, more importantly, false—

---

insureds. Plaintiff Tanner's policy is underwritten by Progressive Southeastern Insurance Company, and she is not seeking to represent a class of Progressive Southeastern insureds. Therefore, this brief proposes certification of a Class comprised only of Progressive Paloverde insureds.

is invalid because it is not based on verified information (in fact, it is based on manipulated data) and, indeed, is based on a verifiably *false* assumption about the used car market.

Auto industry experts explain that Progressive's assumption underlying the PSA—that dealerships overprice vehicles and consumers typically negotiate down from that advertised cash price—reflects a *long*-outdated understanding of the used car market. Given the ubiquity of Internet comparison shopping and the development of sophisticated pricing tools, car dealerships now aggressively price vehicles to market—in other words, the list price must reflect the vehicle's actual cash market value—and list those prices online, because consumers who can compare prices from the comfort of their own home will not visit a dealership advertising an inflated price. This is not conjuncture but, rather, is confirmed by millions upon millions of used car transactional data, including Progressive's ***own data***.

So, how can Progressive possibly justify slashing the list prices of used vehicles used to determine ACV by (on average) ▇▇▇▇ The answer is shocking: Progressive and its vendors exclude from the PSA calculation *every transaction where a used vehicle sold for the Internet list price or a penny or more higher*. In other words, it simply discarded all data that facially invalidated its hypothesis. When the 1-to-1 transactions (transactions where a vehicle sold for its list price) are considered, rather than discarded—in other words, curing solely this single error amongst many in the data analysis—Progressive's data show the median sold-to-list ratio ("S/L Ratio") is a negligible difference of ▇▇ In other words, curing that one error in Progressive's data shows vehicles in the dataset sell for ▇▇ of advertised price. Attached as Exhibit 1 is a graphical portrayal of the S/L Ratio of millions of vehicles, which shows vehicles typically sell for list price.

Because Progressive and its vendors deleted from the data all transactions where a vehicle sold at or above its listed price, Plaintiffs purchased a transparent data set of listed and sold vehicle

prices. Plaintiff's expert matched millions of list-price and sold-price records by VIN number. This unadulterated dataset shows that *the median S/L Ratio is 1*. This is significant: The empirical data confirm list prices are equivalent to market value—just as the used car industry experts opine.

In short, the PSA is capricious, arbitrary, and outright false. Class treatment will ensure that, after Plaintiffs prove their case, Class Members insureds will receive the benefits they are entitled to and paid premiums to receive: the market value of their totaled vehicles. Once the PSA is excised from each detailed individual valuation report, the Mitchell reports document a sound appraisal of ACV following the customary comp methodology. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *26 ("Progressive cannot dispute that applying every aspect of its valuation process other than the PSA leads to an accurate valuation[.]").

This case is eminently suitable for class treatment: Plaintiffs' claims are based on (1) identical form contract language and (2) practices that applied uniformly across the Classes. Plaintiffs' theory is that the PSA deduction can ***never*** be applied under the Policy, while Progressive's is that it can ***always*** be applied. Whether a jury agrees with Plaintiffs or Progressive, resolution of that question will resolve virtually the entirety of Class members' claims in a single stroke. Thus, this Court should grant class certification of the Class defined in Exhibit 13.

## II.    RELEVANT FACTUAL BACKGROUND

### A.  Progressive's Form Policy Terms and Uniform Procedures

Progressive uses form insurance policies with materially identical language. Ex. 2 ("Retton Dep.") at 26-29.[2] In Section IV of the Policy, Progressive promised to pay for "loss" to covered

---

[2] By agreement of the Parties, the deposition of John Retton taken in *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, 5:21-cv-04479-EGS (E.D. Pa.) and *Freeman v. Progressive Direct Ins. Co.*, 1:21-cv-03798-DCC (D.S.C.) are being used in this case in lieu of retaking that deposition, because the issues that would be covered are the same.

autos. Ex. 3 (Policy) at 16. In the "Limit of Liability" subsection, Progressive limits its liability to the vehicle's ACV, *id.* at 20, and states that ACV will be based on the "market value, age, and condition" of the vehicle, *id.* at 21. Plaintiffs and Class members experienced what Progressive determined to be a total loss. Ex. 4 ("Silver Dep.") at 27, 30.[3] Consistent with its Policy terms, Progressive's uniform practice is to base total-loss payments on Mitchell's appraisal of the vehicle's ACV (albeit in an insufficient amount).

## B. **Progressive's Total-Loss Valuation Methodology**

Progressive's methodology for valuing total-loss vehicles is to utilize a third-party vendor, Mitchell, to generate a vehicle valuation report. Retton Dep. at 37-38, 55-59. After an adjuster inputs the vehicle information, the report is generated through the Total-Loss WorkCenter ("WCTL"). *Id.* at 37-38, 40-42; Ex. 5 ("Kroell Dep.") at 20. Progressive used WCTL reports throughout the Class Period as its default method of calculating ACV. Retton Dep. at 37-38, 41-42, 55-59.

These appraisals consist of Mitchell identifying the listed price of comparable vehicles. *Id.* at 37, 51, 59. Then, it applies a PSA deduction to these list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." Retton Dep. at 42-43, 75; *see also* Ex. 6 (Plaintiff Schroeder's Report) at 13. In other words, Progressive's position is that car dealerships uniformly price vehicles above market and negotiate down to the actual market value—thus, according to Progressive, the advertised prices must be reduced by a PSA of (on average) ▮▮▮▮. The new "price"—reduced by the PSA—of each comparable vehicle is then

---

[3] By agreement of the Parties, the depositions taken in *Volino v. Progressive Cas. Ins. Co.*, 1:21-cv-06243-LGS (S.D.N.Y.) of Michael Silver, Phillip Kroell, and Blaine Bogus are being used in this case in lieu of retaking those depositions, because the issues that would be covered are the same.

adjusted based on observed and documented differences, if any, in mileage or equipment. Kroell Dep. at 142-143. The average of the adjusted prices is the vehicle's "base" market value. *Id*. at 144-45. From there, Mitchell adjusts the base market value amount based on the total-loss vehicle itself—if the total-loss vehicle was in below- or above-average condition, for example—which establishes what Progressive represents is the vehicle's adjusted market value. *Id*. at 145. Finally, any taxes, fees, and deductible are automatically applied, which becomes the ultimate claim payment amount. Retton Dep. at 74. Progressive maintains this data in its electronic claims file system. Ex. 7 ("Lacey Report") at 9-12.

## C. Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards

Progressive's assertion that list prices of comparable vehicles are bloated and that consumers routinely negotiate advertised prices down is belied by market forces. Plaintiffs' industry expert explains Progressive's position is an outdated and false characterization of the market. Ex. 8 ("Felix Rep.") at 2-3. ***Many*** years prior to the Class Period, it was perhaps a fair characterization of market forces: Without Internet advertising and sophisticated pricing tools, the "sticker" price was not really a factor—consumers went to the local dealership with the desired vehicle type and could not easily compare listed prices across numerous dealerships. *Id*. at 3. Now, not only can dealers identify the precise amount at which comparable vehicles are listed in the market, but so too can consumers—and if the dealership prices above market, consumers will know it and will patronize competing dealerships who priced to market. *Id*. at 3-5.

This does not mean vehicles invariably sell for the precise listed price—there are numerous reasons unrelated to actual ***cash*** value why vehicles sell for less or more than listed price. For example, a dealership might sell a vehicle for less than list price if, inter alia, (1) they are getting points on a loan; (2) there is a special discount (military, employee, friends/family); (3) a consumer

is entitled to apply a "credit" earned through use of the service department; or (4) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle. *Id*. at 6-8. But these reasons are unrelated to the actual market price of a vehicle. *Id*. at 8.

Additionally, Plaintiffs' appraisal expert explains the "comp" methodology Progressive utilizes is essentially a line-item method to arrive at the ACV of damaged property, pursuant to which appraisers take the list prices of comparable vehicles and make line-item adjustments for documented differences between the comparable vehicle(s) and insured vehicle in mileage, equipment, and condition. Ex. 9 ("Merritt Rep.") at 2-4. Any adjustment must be based on observed, documented, and verifiable data. *Id*. Other than the PSA, Mitchell's method is consistent with this standard and documents a detailed, sound, and reliable appraisal of each loss vehicle that Progressive presents to the insured as ACV. *Id*. at 7-9.

But Progressive deviated from proper appraisal standards in applying the PSA. *Id*. at 4-7. Because the PSA is not based on observed, verified data, it is necessarily arbitrary and inconsistent with proper appraisal standards. *Id*. at 6-7. As Merritt explains, the proper method for identifying a vehicle's ACV is to take the average price of comparable vehicles, adjusted for documented differences in mileage, condition, and equipment. *Id*. at 2-4. As such, the market value of every Class member's vehicle is identified in the valuation reports. *Id.* at 7. Simply remove the PSA deductions, and the detailed valuation report identifies the vehicle's ACV. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *26; *Brown*, 2023 U.S. Dist. LEXIS 136472, at **7-8.

### D. To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory

Notwithstanding these market realities and standards, Progressive imposes a PSA deduction that averages ███ Lacey Report at 13. This is in line with the ████████

████████████████████████████████████, *id*., and is achieved by manipulating (and then misrepresenting) the data.

Here is how it works: Mitchell hires Blaine Bogus and a three-person team (the "Bogus Team") at J.D. Power to calculate the PSA. Ex. 10 ("Bogus Dep.") at 17-18. Mitchell provides list price data gathered from Internet advertisements. *Id*. at 21. The Bogus Team compares that data to sales data from its "Power Information Network" ("PIN") of dealers. *Id*. at 21-22. The Bogus Team's data is a black box: Neither Progressive, Mitchell, nor the Bogus Team has conducted any analysis to determine whether the PIN dealers are representative of the used vehicle market and, instead, simply "assum[e] it would be reflective of the general market." Bogus Dep. at 155:18–156:16. J.D. Power refuses to disclose any dealership from which it obtains sales data and has designated it as "Highly Confidential—Outside Counsel's Eyes Only." Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most shocking part of this scheme is that, in calculating the PSA, the Bogus Team simply excluded from the data all transactions where the sales price exceeds the list price and, until July 2021, it also excluded every transaction where the vehicle sold for list price. Bogus Dep. at 57-60; Lacey Report at 3-5. This bears repeating: The Bogus Team made the spurious assumption that transactions at or above list price are outliers, notwithstanding the fact that it never conducted a single analysis to determine how often those purported "outliers" occur and, in fact, had no idea how many records were being excluded. Bogus Dep. at 57-58, 61-63. A simple analysis shows that transactions selling at list price—not even counting transactions where a vehicle sold for more than list price—constitute ████████ *of the transactions* in the PIN data. Lacey Report at 4. Discarding and deleting data because of an undesirable (to Progressive) but relevant characteristic

invalidates the data. *Id.* Correcting for the *single* deliberate error of omitting transactions at list price results in a negligible ▮ variance between sold and list prices. *Id.* & Exhibit 8 thereto at 2.

And this does not even account for transactions where the sold price exceeded the list price by a penny or more, which the Bogus Team also discarded, keeping no record of how many of such transactions were excluded. Bogus Dep. at 137; Lacey Report at 4-5. For a vehicle to sell for higher than its listed price is not an outlier or an oddity. Felix Rep. at 8-10. Mr. Martin identified that 23.47-29.93% of vehicles were reported to the DMV as sold for more than listed price. Ex. 11 (Martin Rep.) at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 44, 46, 48, 51.

Moreover, the Bogus Team does not account for—and has never even investigated— transactions involving a military/employee/family discount, financing through the dealership, or other reasons a sold price might be less than list price that are unrelated to a vehicle's market value. Bogus Dep. 73:22–75:5. Instead, after tossing transactions selling at list price or a penny more, the Bogus Team credulously accepts that *any difference* up to a staggering ▮ between list and sold price is the product of negotiation in a cash transaction,[4] despite never taking any effort to determine whether that is true. *Id.* at 74:20–75:5. Consider that one of the primary reasons a vehicle might sell for less than list price is that a dealership simply offered less than it otherwise would have on a vehicle trade-in—or might be incentivized to sell for a below market price because the purchaser has an attractive trade-in. Felix Rep. at 6-7. Not only are these instances unrelated to actual market value, they are irrelevant in the context of total-loss insureds, as they have no vehicle to trade in.[5] Also, instances where a dealership might chop a few hundred dollars off list price

---

[4] Like Mr. Felix, Plaintiffs are using "cash transaction" to encompass transactions where the consumer self-financed entirely as well as transactions where the consumer secured outside financing rather than using the dealership to secure financing.
[5] There are numerous other flaws in the Bogus Team's analysis, as set forth in Dr. Lacey's Report and Appendix. Critically, Dr. Lacey, for purposes of the Appendix, essentially adopted the Bogus

because the consumer is financing through the dealership—meaning it will more than make up the profit difference—are irrelevant because Progressive owes actual *cash* value, not actual financed value. And that some people may be entitled to a discount is irrelevant to the *actual* market value.

Unfortunately, in response to Plaintiffs' subpoenas, Progressive's vendors claim they no longer have the full transactional data and thus cannot calculate the actual difference (if any) between sold and list prices when considering all transactions. So, Plaintiffs retained a statistician, Jeffrey Martin, to analyze a large set of transparent data reported by all dealers to state DMV offices. He identified a robust sample size of 1.4 million-2.4 million matches *per year*. Martin Rep. at ¶¶ 25, 32, 39, 46. The results confirm Mr. Felix's testimony: The median S/L Ratio for each year is 1 (meaning sold and list price are equal), regardless of whether all transactions are considered or if outlier ranges are applied. *Id*. at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 43, 46, 48, 51. The mean S/L ratio is negligible 0.995-to-1 (meaning sold prices were, on average, a mere 0.05% lower than listed prices, at most). *Id.* at ¶¶ 34, 37, 41, 43, 48, 51, 54, 57. These findings confirm that list price equates to market value and, thus, that the PSA deduction is invalid. These results are summarized in the figures and tables in Exhibit 1.

In short, instead of looking at the data honestly, Progressive and its vendors began with a forgone conclusion: "Consumers negotiate down the advertised price of vehicles in cash transactions." They then manufactured "support" and thumbed the scale by ignoring and deleting all market data to the contrary. Once this lone invalid adjustment is removed, each Mitchell Report documents a good faith appraisal of each Class Member's loss vehicle. Certifying this case for

---

Team's assumptions and demonstrated that even when accepting such flawed assumptions, the Bogus Team's analytical approach does not faithfully represent the data.

class treatment is proper under well-established law and will ensure Class Members receive the ACV they are entitled to, and paid premiums for, under their Policies.

### III.    ARGUMENT

To certify a class, the four prerequisites of Rule 23(a) must be satisfied, along with at least one of the requirements listed in Rule 23(b). *Vandehey v. Client Servs.*, 390 F. Supp. 3d 956, 959 (E.D. Wis. 2019). While courts may consider the merits of the plaintiffs' underlying claims to determine if Rule 23's requirements have been satisfied, this does not extend to a free-ranging merits inquiry. *See Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013). In other words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Ramirez v. GLK Foods, LLC*, No. 12-C-210, 2014 U.S. Dist. LEXIS 80073, at *8 (E.D. Wis. June 10, 2014). District courts have discretion in determining whether class treatment is appropriate. *See Est. of VanDam ex rel. Horizon Tr. & Inv. Mgmt., N.A. v. Daniels*, 278 F.R.D. 415, 422 (S.D. Ind. 2011). But if a plaintiff shows the Rule 23 elements are met, the discretion disappears. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) (Rule 23 "creates a categorical rule entitling a plaintiff" who satisfies the Rule's elements "to pursue his claim as a class action.").

### A.    The Class Is Ascertainable

A threshold requirement for certification under Rule 23(b) is the class must be ascertainable. *Mullins v. Direct Dig., Ltd. Liab. Co*., 795 F.3d 654, 657 (7th Cir. 2015). The Seventh Circuit has held that ascertainability is satisfied by "defining classes clearly and with objective criteria." *Id.* at 672; *Rhodes v. Enhanced Recovery Co., LLC*, 328 F.R.D. 225, 228 (S.D. Ind. 2018) (same). This standard is met here.

11

In the Seventh Circuit, ascertainability addresses "the adequacy of the class definition," not whether "it would be difficult to identify particular members of the class." *Mullins*, 795 F.3d at 659; *Rhodes*, 328 F.R.D. at 228. In *Mullins*, the Seventh Circuit identified three types of class definitions that can fail the ascertainability test: vagueness, subjectivity, and failsafe classes (795 F.3d at 657), none of which apply here. The proposed Class is based on specific, tangible facts, and, thus, is neither vague nor imprecise. Second, as detailed in Dr. Lacey's Report at pages 9-12, the parties and the Court can determine if someone is a Class member based on objective, identifiable criteria in the electronic claims data and documentation maintained by Progressive.. Every criterion for membership—insured by Progressive, date of loss, whether it was a covered total-loss claim, whether it was based on a Mitchell Report, and whether a PSA was applied—is objective, not subjective criteria such as state of mind. *See Brown*, 2023 U.S. Dist. LEXIS 136472, at *7 (concluding ascertainability satisfied upon finding that the criteria of membership "are objective in nature and are readily found in Progressive's electronic data"); *Mullins,* 795 F.3d at 660 ("Plaintiffs can generally avoid the subjectivity problem by defining the class in terms of conduct (an objective fact) rather than a state of mind.").  Finally, the proposed Class is not a failsafe class—meaning class membership does not turn on whether the insured wins or loses on the merits. *See id*. (explaining that failsafe classes are those that "are defined in terms of success on the merits").

Because ascertainability is concerned with the class definition and not "the difficulty of identifying" class members, *id*. at 659, courts in the Seventh Circuit have explained that ascertainability is not defeated simply because it may necessitate a manual review of individual claims files. *Moreno v. Napolitano*, No. 11 C 5452, 2014 U.S. Dist. LEXIS 138576, at *21-22 (N.D. Ill. Sep. 30, 2014) ("[T]he Court finds that Plaintiffs have identified an ascertainable class,

12

and the fact that Defendants may need to conduct a manual review to determine the composition of the class is not sufficient grounds for denying class certification."); *see also Young v. Nationwide Mut. Ins. Co*., 693 F.3d 532, 539-40 (6th Cir. 2012) ("Plaintiffs' classes are defined by classic categories of objective criteria . . . the need to manually review files is not dispositive. If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained."). Here, identification of Class members can be made based *solely* on Progressive's own records—and although it may require looking at individual Reports, this does not preclude certification. *See id*.; *see also Brown*, 2023 U.S. Dist. LEXIS 136472, at *7.

## B. <u>Common Issues Predominate</u>

Under Rule 23(a)(2), there must be questions common to the class; meaning, there is at least one question the answer to which "will resolve an issue that is central to the validity of [each claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "'[T]he issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.'" *Barden v. Hurd Millwork Co*., 249 F.R.D. 316, 320 (E.D. Wis. 2008) (internal quotations omitted). "Thus, the primary consideration in assessing predominance is the proof necessary to establish the class members' claims under the applicable substantive law." *Id.* Issues which satisfy the predominance inquiry are those where the same evidence suffices for each class member or there is a central issue susceptible to class-wide proof. *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (citing 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-97 (5th ed. 2012)). Importantly, "[i]t is well established that the presence of individualized questions regarding damages ***does not***

*prevent certification* under Rule 23(b)(3)." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (emphasis added).

**1. The elements of the breach of contract claim are subject to common proof that predominate over any individual questions.**

Commonality is satisfied because whether Progressive's application of the PSA to comparable vehicles' listed prices constitutes a breach of the form Policy is subject to common proof and, thus, its answer will apply equally to all Class members. Whether a breach occurred turns on two key questions, both of which are subject to common evidence: (1) whether the PSA deduction is baseless and invalid, considering the data ignored and discarded from the calculation and evidence about dealer pricing practices in the modern used car market, and (2) whether under the standard appraisal "comp" method, the invalid PSA deduction must be excised from insureds' valuation reports to arrive at a proper ACV amount. Moreover, all Class members were subject to the same Policy language and business practices. Retton Dep. at 26-29. The central question is whether application of the PSA means, as Plaintiffs suggest, Progressive is not calculating "market value" as contractually required but is, instead, calculating an artificially reduced amount. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *22 ("[T]he key question for both claims and for all classes and subclasses is, in substance, whether the PSA reflects how cars are valued and sold in the market."); *Brown*, 2023 U.S. Dist. LEXIS 136472, at *9 ("Determining whether Progressive's application of the PSA constitutes a breach of its form policy would resolve the primary merits-based 'issue that is central to the validity of each one of the claims in one stroke.'"); *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *32 ("Progressive maintains the PSAs are legitimate . . . plaintiffs maintain they are inaccurate," and it "is this dispute . . . that is at the center of this action); *Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980-81 (8th Cir. 2021) (holding that if it were true that the PSA is "contrary to industry practices and consumer experiences and therefore not

reflective of the vehicle's fair market value, then the insurance company did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty") (cleaned up); *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-2482-TLP-cgc, 2022 WL 17592417, at *6 (W.D. Tenn. Sept. 26, 2022) (denying insurer's motion for summary judgment on breach-of-contract claim where insurer utilized a uniform deduction to supposedly account for consumer negotiating behavior and stating "[t]he issue here instead is whether Defendant knowingly and without explanation reduced the cash value for Plaintiff's total loss vehicle using a single line-item deduction in its routine claims-settlement practice"). Resolving this issue is the crux of this case and will resolve the dispositive issue in every Class member's claim, satisfying the commonality requirement.

These common issues predominate over individual issues. The elements of breach of contract under Indiana law require evidence of (1) an enforceable contract, (2) a breach, and (3) damages resulting from that breach. *Neurology & Pain Mgmt. Assocs., P.C. v. Bunin*, No. 3:17-CV-035 JD, 2018 WL 3830059, at *2 (N.D. Ind. Aug. 13, 2018). It cannot be disputed that the first element is subject to common proof, as Progressive has already identified every total-loss insured covered by its policies during the relevant time-period.

The breach element is also subject to common proof: (i) the form Policy language applicable to every Class member, which establishes the relevant duty; (ii) expert testimony that dealerships price to market and therefore the list price of comparable vehicles is reflective of cash market value, as reflected by even Progressive's own purposely truncated market data and by the DMV data; and (iii) expert testimony that the PSA is unjustified, arbitrary, capricious, and not reflective of the used car market. None of the testimony is particular to a given vehicle: Plaintiffs' statistical experts will provide their analysis that the PSA is not supported by a proper statistical

methodology or by the data, which the jury will find persuasive or not, but it is not particular to specific vehicles. Felix will testify that, as reflected in the data, car dealers price to market, which the jury will find persuasive or not—either way, such testimony applies classwide. Merritt will testify that the way to identify ACV is to take the average of comparable vehicles, adjusted for differences in mileage, equipment, and condition—in other words, the Mitchell method but without the PSA. A jury will either agree or not, but either way, the outcome will apply equally to the Class.

In sum, the jury will be presented with two competing viewpoints. Progressive's witnesses will testify that the PSA is a proper part of its uniform method of calculating ACV. Plaintiffs will also proffer a uniform method of calculating ACV, but their witnesses will testify that the PSA is invalid, in conflict with market forces and vast empirical evidence, and not a proper element of calculating ACV. Regardless of whether a jury agrees with Progressive or Plaintiffs, its answer will apply classwide—and as such, the predominating question in this litigation is common to the Class, and liability issues subject to common proof predominate over any issues subject only to individual proof. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *24 ("[T]he critical common questions identified by Plaintiffs predominate over those individual inquiries."); *see also Brown*, 2023 U.S. Dist. LEXIS 136472, at *17 (agreeing that the common issues of law and fact "are subject to common proof—particularly from the parties' experts—and 'the jury will either agree or not' with each side's position, but "[e]ither way, . . ., 'it applies equally to the Class.'").

## 2. The elements of a claim for breach of the covenant of good faith and fair dealing are subject to common proof that predominate over any individual questions.

Predominance is also satisfied with respect to whether Progressive's application of the PSA to comparable vehicles' listed prices constitutes a breach of the covenant of good faith and fair

dealing. In Indiana, the duty of good faith and fair dealing is implied "in the context of employment contracts, insurance contracts, and certain other limited circumstances." *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 856 (7th Cir. 2017); *Kimmel v. W. Rsrv. Life Assur. Co. of Ohio*, 627 F.3d 607, 612 (7th Cir. 2010) ("Indiana law recognizes that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured."). Whether a breach of the covenant of good faith and fair dealing occurred turns on the same two questions relevant to the breach of contract claim. As stated above, all Class members were subject to the same Policy language and business practices. The central question is whether application of the PSA means, as Plaintiffs allege, that Progressive is not calculating "market value," but is instead calculating an artificially reduced amount. These common issues predominate over individual issues. Moreover, to take just one example, Plaintiffs alleged that Progressive failed to undertake any investigation or analysis into whether the PSA is legitimate, reflects market forces, and is based on sound empirical data. Dkt. No. 59 at ¶¶ 36-37; *see also Watson v. Progressive Direct Ins. Co.*, 2022 U.S. Dist. LEXIS 233630, at **35-36 (E.D. Ky. Dec. 30, 2022) ("While Progressive is not expressly required to research how the PSA is calculated in its insurance policy, its commitment to pay the ACV of a total-loss vehicle carries the implied promise that the defendant ensure that its calculations reflect market realities."). It cannot be disputed that if this failure violates the covenant of good faith and fair dealing, it does so as to all members of the Class.

Progressive's lack of good faith is illustrated by the same common proof applicable to the breach element of Plaintiffs' breach of contract claim. *See Clippinger*, 2022 WL 17592417, at *8 ("The Court explained above that there is a triable issue of fact about whether Plaintiff can prove the breach and damages elements of her breach of contract claim. And Plaintiff's supporting

17

evidence of these elements could also persuade a reasonable jury that Defendant failed to act in good faith under the Policy.").

**3. Plaintiffs' damages model fits their theory of liability, and any individual issues of damages cannot predominate over common issues of liability.**

The measure of damages here is the amount of the PSA deduction—calculated as the total amount of the PSA deductions, divided by the number of comparable vehicles utilized—plus prejudgment interest. Lacey Report at 12-13. Plaintiffs' theory on the merits is that, because an honest look at vast empirical data, consistent with expert testimony from those with knowledge of how the used auto market works, confirms that vehicles typically sell for their list price, and because any adjustments to the price of comparable vehicles must be based on verified information, not foregone conclusions, the listed price of comparable vehicles adjusted for differences in mileage, options, and condition (which Progressive imposes and Plaintiffs do not challenge), constitutes the actual cash market value of an insured vehicle. If a jury agrees, damages are a ministerial calculation: the difference between actual market value and the artificially deflated value after imposition of the PSA deductions. Merritt Rep. at 7-8; Lacey Rep. at 12-13; *see also* Newberg on Class Actions § 12:2 ("a common method for showing individual damages— a simple formula could be applied to each class member's … records—[is] sufficient for the predominance [] requirement[] to be met.").

This damages model is consistent with Plaintiffs' theory of liability. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *32 ("Because Plaintiffs take the position that the PSA should not exist at all, a damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory."); *Brown*, 2023 U.S. Dist. LEXIS 136472, at *24 ("[T]he Court finds that Plaintiffs' proposed damages methodology aligns with their liability theory and that common issues predominate with respect to damages. And though the specific determination of damages

may require individualized calculations, "the necessity of calculating damages on an individual basis will not necessarily preclude class certification."). Other than the application of the PSA, Plaintiffs agree with how market value was calculated by Mitchell, *i.e.*, the "comp" method. *See* Merritt Rep. at 7. Numerous cases across the country—including in the more complicated context of real-property disputes—have been certified as class actions where plaintiffs put on proof that one step in a multistep appraisal process is improper and proposed a damages model of excising the offending portion of the valuation.

In *Volino*, *Brown*, and *Drummond*, the courts granted class certification on identical facts. *Volino*, 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023); *Brown*, 2023 U.S. Dist. LEXIS 136472; *Drummond*, 2023 U.S. Dist. LEXIS 140205. In each of the three cases, as here, the plaintiffs challenged Progressive's application of PSA deductions, alleging that the PSAs were unfounded and illegitimate because Progressive "cherry-picks the vehicles used to calculate the PSA, manipulating the dataset to produce a much larger downward adjustment in price than is warranted by current market realities." *Volino,* 2023 U.S. Dist. LEXIS 44666, at *8. And in those cases, as here, plaintiffs' appraiser experts opined that Progressive's reports documented a sound appraisal of ACV following a comp methodology once the PSAs are removed. *Volino,* 2023 U.S. Dist. LEXIS 44666, at *13; *Brown*, 2023 U.S. Dist. LEXIS 136472, at *23; *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *18-19. So "[i]f the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle." *Volino,* 2023 U.S. Dist. LEXIS 44666, at *8. Thus, each of the three courts found common issues of law and fact predominated and that plaintiffs' "damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory." *Volino,* 2023 U.S. Dist. LEXIS 44666, at *32; *see also Brown*,

2023 U.S. Dist. LEXIS 136472, at *24 *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *36. This is precisely the case Plaintiffs are bringing here.

Courts have similarly sustained class treatment where insureds challenge other discrete components of their insurers' ACV appraisals. For example, in *Slade v. Progressive Sec. Ins. Co.*, the plaintiffs alleged Progressive used a source to calculate the base value—that is, before condition adjustments are made based on inspection of the loss vehicle—of their totaled vehicles. 856 F.3d 408, 411 (5th Cir. 2017). Like here, the plaintiff did *not* contend that the entire valuation must be scrapped, but only the offending portions excised. *Id*. The court found the theory of liability and damages matched. *Id*. at 411 ("there is no principled reason why" Progressive's own unchallenged adjustments could not be applied to the new, properly calculated base value to determine the damages amount); *accord Volino*, 2023 WL 2532836, at *11. The only distinction here is one without a difference: Rather than scrapping the base value wholesale and substituting another source in its place, as in *Slade*, Plaintiffs' proof will show that, like in *Volino*, the Mitchell appraisal reports document a sound appraisal of ACV once the offending PSA deductions are excised. *See Brown*, 2023 U.S. Dist. LEXIS 136472, at *22-23 ("This case is similar to *Slade*, but the damages calculations here are even more suitable to class-wide determination.")

Lower courts applying *Slade* have had little difficulty certifying for class treatment claims challenging a single problem with an ACV determination and putting on proof of how to fix that problem, while keeping the non-offending portions. *Shields v. State Farm Mutual Automobile Insurance Co*., Case No. 6:19-cv-1359, 2022 WL 37347, at *8 (W.D. La. Jan. 3, 2022); *Sampson v. United Services Automobile Association*, Case No. 6:19-cv-896, 2022 WL 1415652, at *8 (W.D. La. May 3, 2022). Another example: In *Lewis v. Gov't Employees Ins. Co.*, where the plaintiff

contested a discrete adjustment, the court found class treatment proper to resolve the validity of that adjustment. No. 18-5111 (RBK/MJS), 2022 WL 819611 (D.N.J. Mar. 18, 2022).

Likewise, the Sixth Circuit and other courts of appeal have upheld class certification in the more complicated real-property context where plaintiffs put on proof that one step in a multistep appraisal process was improper and proposed a damages model of excising the offending portion of the valuation. *See, e.g.*, *Hicks v. State Farm*, 965 F.3d 452, 460–61 (6th Cir. 2020); *Mitchell v. State Farm*, 954 F.3d 700, 710–711 (5th Cir. 2020); *Stuart v. State Farm*, 910 F.3d 371, 375–76 (8th Cir. 2019). In *Hicks*, for example, the Sixth Circuit affirmed class certification where plaintiffs alleged State Farm failed to pay the ACV of their damaged property by improperly deducting labor depreciation. 965 F.3d 452. There, as here, the plaintiffs' theory of liability was that, but for this one improper and illegal line-item adjustment, they would have received a proper payment of ACV. *Id.* at 456. And there, as here, the plaintiffs presented a damages model that simply excised that single line-item deduction. *Id.* at 460.

Moreover, as these three Circuits explained, class treatment of claims challenging a single line-item deduction is proper even where insurers attempt to argue there may have been an **over**payment as to an unchallenged aspect of the ACV calculation. In *Hicks*, State Farm argued certification was inappropriate because, even if it were not permitted to depreciate labor, "it may have miscalculated ACV payments based on individualized errors unrelated to depreciating labor costs" and these other errors may have exceeded the depreciation amount. *Id*. at 460. "Put another way, State Farm intends to defend against the claims of individual class members by proving that some insureds were not damaged because it either overestimated ACV payments to such a degree that the deduction of labor depreciation resulted in no damages or it mistakenly reimbursed labor depreciation costs to RCV claimants for more than they were owed." *Id.* The Sixth Circuit rejected

this argument because "'any overestimation . . . simply operates as an error in the insured's benefit.'" *Id.* at 461 (quoting *Stuart,* 910 F.3d at 376-77*).* And even if "this sub-issue were to become relevant at the merits stage," it might be resolvable through subclasses or bifurcation. *Id.* at 462. Likewise, in *Mitchell*, the Fifth Circuit stressed that "whether State Farm made an error in estimating" other elements of the ACV calculation "is a question separate from this class litigation," and left it to the district court to determine "how to handle sub-issues that may or may not arise in granting class relief." 954 F.3d at 711. Finally, in *Stuart*, the Eighth Circuit also rejected State Farm's argument, holding that "the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." 910 F.3d at 376. All of this is consistent with *Volino*, which explained that arguments that Progressive may have overvalued some other aspect of the ACV calculation "are speculative and would not defeat predominance even if they were relevant." 2023 U.S. Dist. Lexis 44666, at *29.

Here, the clearly predominant question is whether Progressive's application of the PSA means it was not considering market value and was instead paying an artificially deflated value. *See Smith*, 18 F.4th at 980-81. If so, the clear remedy—just as in the numerous cases discussed above—is awarding damages calculated by backing out the invalid PSA deduction from the Mitchell reports. But even if the jury rejects such measure of damages, class certification is appropriate—at that point, this Court would possess a number of options, including notifying Class members that the jury determined Progressive breached its contract by failing to consider market value, but that each Class member may need to take additional steps to establish their individual damages amount. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001). And "[i]t is well established that the presence of individualized questions regarding

damages *does not prevent certification* under Rule 23(b)(3)." *Messner*, 669 F.3d at 815 (emphasis added).

In sum, Plaintiffs' claims are "sufficiently cohesive to warrant adjudication by representation." *Messner*, 669 F.3d at 814 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 632 (1997)); *see also Volino*, 2023 U.S. Dist. LEXIS 44666, at *32; *Brown*, 2023 U.S. Dist. LEXIS 136472, at *24.

### C. The Remaining Rule 23(a) Prerequisites Are Met

#### 1. The Class is numerous such that joinder is impracticable.

Fed. R. Civ. P. 23(a)(1) requires that the proposed Class be so numerous that joinder is impracticable. There is no strict numerical test to satisfy this requirement. "[A] class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Chapman v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). "'How many (if any) of the class members have a valid claim is the issue to be determined after the class is certified.'" *Id.* But even forty class members "is a sufficiently large group to satisfy Rule 23(a)." *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326, 1333 & n.9 (7th Cir. 1969). Progressive produced claims data for the putative Class showing there are over ███ members of the Class. Lacey Rep. at 12. This easily satisfies Rule 23(a)(1). *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *18-19.

#### 2. Plaintiff is typical of, and will adequately represent, the Class.

Under Rule 23(a)(3), typicality is established where the plaintiff's claim arises from the same events giving rise to the class members' claims, and those claims are based on the same legal theory. *Wilburn v. Nelson*, 329 F.R.D. 190 (N.D. Ind. 2018). "[T]he claims only need to share the same essential characteristics and need not be identical, [thus,] the typicality requirement is not highly demanding." *Hazelwood v. Bruck Law Offices SC*, 244 F.R.D. 523, 525 (E.D. Wis. 2007).

Progressive's practices are uniform. It is undisputed that the form Policies contain identical language, and that Progressive applied a PSA to the listed price of comparable vehicles for every Class Member, which is the practice that gave rise the claim. *see* Lacey Rep. at 9-12 and Exhibit 4 thereto. This case will turn on whether this uniform practice is authorized by the plain language of the Policy. The claims arise from the same challenged conduct and share the same essential characteristics, which satisfies the typicality requirement. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *19-21 (rejecting Progressive's challenges to typicality and finding that, "[c]ontrary to Progressive's argument, the named Plaintiffs' claims, and Progressive's related defenses, are typical of the class as a whole."); *Brown*, 2023 U.S. Dist. LEXIS 136472, at *11 (finding typicality where "the putative class's claims all arise from the same 'course of conduct'—that is Progressive allegedly undervaluing total-loss claims by applying a PSA").

Plaintiff also satisfies the Rule 23(a)(4) adequacy requirement. *See generally CE Design Ltd. V. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (explaining that typicality and adequacy requirements generally go hand-in-hand). Adequacy requires the Court to consider three criteria: "(1) the representative's interest cannot be contrary to those of the rest of the class; (2) the class representative must be sufficiently interested in the case outcome; and (3) class counsel must be qualified, experienced, and generally able to conduct the case." *Dokey v. Spancrete, Inc*., No. 19-CV-921-JPS, 2021 U.S. Dist. LEXIS 27715, at *13 (E.D. Wis. Feb. 12, 2021) (internal citations omitted).

Plaintiff possesses personal interests in the outcome of this case, has presented no claims that would be detrimental to the Class's interests, and all Class members would benefit from a finding that the PSA is improper and constitutes a breach. Further, Plaintiff has retained qualified counsel with experience litigating class action cases and who are committed to expending the

resources necessary to prosecute this claim. Ex. 12 ("Bates Decl.") at ¶¶ 2-4. Both Rule 23(a)(4) and Rule 23(g) are satisfied. *See* Fed. R. Civ. P. 23(g)(1); *see also Volino*, 2023 U.S. Dist. LEXIS 44666, at *21 ("Contrary to Progressive's argument, 'the representative parties will fairly and adequately protect the interests of the class.'"); *Brown*, 2023 U.S. Dist. LEXIS 136472, at *11-13 (finding plaintiff and plaintiff's counsel satisfy Rule 23's adequacy requirement and rejecting Progressive's argument that "certain class members would have benefitted from the application of the PSA" under a different methodology).

## D. **Class Treatment Is Superior**

Factors relevant to determining whether class treatment is superior to other forms of adjudication are: (A) any interest in individually controlling prosecution; (B) whether any litigation has already commenced; (C) the desirability of concentrating litigation; and (D) manageability. Fed. R. Civ. P. 23(b)(3).

Here, Plaintiff Schroeder's PSA damages are $593.63,. Lacey Rep. at 12. This is a relatively small amount compared to the cost of litigating against a large insurance company. In *Amchem*, the Supreme Court noted that the central policy underlying the class action mechanism is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). The Seventh Circuit has held that "'[t]he class action is an ingenious device for economizing on the expense of litigation and enabling small claims to be litigated.'" *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744 (7th Cir. 2008). Plaintiff is unaware of any other litigation in Indiana against Progressive raising these claims— and even if there were, it would nevertheless be desirable to concentrate litigation of these claims into one court and in one action for purposes of efficiency and judicial economy. Fed. R. Civ. P. 23(b)(3)(c).

Finally, class treatment is manageable. Liability will be established through common evidence of Progressive's uniform Policy provisions and method for valuing total loss claims. Even if management was likely to be difficult—and to be clear, it will not be—the relevant comparison is to individual litigation, not to no litigation at all. *See Mullins*, 795 F.3d at 672. For this reason, a manageability concern "will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004). There is no question that class treatment is more manageable than ███ + individual cases, which is why "economies of time, effort, and expense" coupled with a focus on "uniformity of decision[s] as to persons similarly situated," is the main manageability concern. *Hohmann v. Packard Instrument Co.*, 399 F.2d 711, 715 (7th Cir. 1968). Here, there are no manageability concerns—identifying Class members is formulaic and based on objective, verifiable data in Progressive's records. Lacey Rep. at 9-12.

Accordingly, classwide adjudication is the superior method for resolving this dispute.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be granted.

Dated: August 22, 2023

Respectfully submitted,

*/s/ Jake Phillips*

Jacob L. Phillips (admitted *pro hac vice*)
**NORMAND PLLC**
3165 McCrory Place, Ste. 175
Orlando, FL 32803
Tel: 407-603-6031
Jacob.phillips@normandpllc.com

Scott D. Gilchrist, #16720-53
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: 317-636-6481
Fax: 317-636-2593
sgilchrist@cohenandmalad.com

Andrew J. Shamis (admitted *pro hac vice*)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Tel: 305-479-2299
ashamis@shamisgentile.com

Joseph Henry (Hank) Bates, III (*pro hac vice*)
Edwin Lee Lowther, III  (*pro hac vice*)
Arkansas Bar No. 2013142
**CARNEY BATES & PULLIAM, PLLC**
519 W. 7th Street
Little Rock, AR 72201
Telephone: (501) 312-8500
hbates@cbplaw.com
llowther@cbplaw.com

***Attorneys for Plaintiff & Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was filed electronically on this 22nd day of

August, 2023, and will be served upon all counsel or parties of record through the Court's

Electronic Case Filing system.

_/s/ Jake Phillips_____

Jacob L. Phillips (admitted _pro hac vice_)
