**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| HEATHER SCHROEDER and MISTY TANNER, *individually and on behalf of others similarly situated,*<br><br>        Plaintiffs,<br><br>    v.<br><br>PROGRESSIVE PALOVERDE INSURANCE COMPANY and PROGRESSIVE SOUTHEASTERN INSURANCE COMPANY,<br><br>        Defendants. | Case No. 1:22-cv-00946-JMS-MKK |

**DEFENDANTS' OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

I.    Plaintiffs' Claims Under Their Indiana Insurance Policies with Progressive ..................... 3

II.   PSAs Are Based on Hard Data from Real Transactions. ..................................................... 5

III.  Evidence Regarding the Market for Used Vehicles and the PSA. .................................. 6

IV.   The Varying Approaches to Estimating a Vehicle's Actual Cash Value and Plaintiff's Phantom "Appraisal Standards." ..................................................................... 9

ARGUMENT ............................................................................................................... 11

I.    Plaintiff's Superficially Common Questions are Not Common at All. ........................... 12

  A.  Many used car dealers sell cars for below the advertised list price. ............................. 12

  B.  Whether removing the Projected Sold Adjustment from a WCTL report results in Actual Cash Value cannot be resolved with common evidence. ........................................... 14

II.   Individualized Issues Predominate and Foreclose Class Certification. ............................ 16

  A.  Whether Progressive paid each insured less than Actual Cash Value is an individualized issue that predominates over all others. .......................................................... 17

  B.  Determining damages for any injured class member also requires individualized inquires. ...................................................................................................... 26

III.  Plaintiff Is an Atypical and Inadequate Class Representative........................................ 27

IV.   Class Treatment is Not Superior and the Class Is Not Ascertainable. ........................... 29

CONCLUSION ............................................................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angell v. GEICO Advantage Ins. Co.*,
  67 F.4th 727 (5th Cir. 2023) ...................................................................................24

*Brown v. Progressive Mountain Ins. Co.*,
  No. 3:21-cv-00175-TCB (N.D. Ga. Aug. 3, 2023) ..................................................25

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ...................................................................................27

*Clark v. Experian Info. Sols., Inc.*,
  No. Civ.A.8:00-1217-24, 2001 WL 1946329 (D.S.C. 2001)...................................28

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)....................................................................................................25

*Conrad v. Boiron, Inc.*,
  869 F.3d 536 (7th Cir. 2017) ...................................................................................27

*Curtis v. Progressive N. Ins. Co.*,
  No. CIV-17-1076-PRW, 2020 WL 2461482 (W.D. Okla. May 12, 2020) .....................15, 22

*Drummond v. Progressive Specialty Ins. Co.*,
  No. 5:21-cv-04479-EGS, 2023 WL 5181596 (E.D. Pa. Aug. 11, 2023) .........10, 15, 16, 18, 25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)........................................................................................11, 12, 16

*Erie Ins. Co. v. Hickman*,
  622 N.E.2d 515 (Ind. 1993) .....................................................................................17

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
  29 F.4th 839 (7th Cir. 2022) .............................................................................11, 19

*Hansen v. Country Mut. Ins. Co.*,
  No. 18 C 244, 2023 WL 6291629 (N.D. Ill. Sept. 25, 2023)...................................22

*Hicks v. State Farm Fire & Cas. Co.*,
  965 F.3d 452 (6th Cir. 2020) ...........................................................................23, 24

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) ...........................................................................12, 13

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ..................................................... 1, 2, 14, 15, 17, 18, 19, 25, 26

*Lara v. First Nat'l Ins. Co. of Am.*,
   25 F.4th 1134 (9th Cir. 2022) ............................................. 2, 13, 14, 17, 18, 19, 21, 25, 29

*Lewis v. GEICO*,
   No. 18-5111, 2022 WL 819611 (D.N.J. Mar. 18, 2022) ......................................... 23

*Lewis v. GEICO*,
   No. 22-8055 (3d Cir. Dec. 22, 2022), ECF No. 21-1 ............................................ 23

*Mitchell v. State Farm Fire & Cas. Co.*,
   954 F.3d 700 (5th Cir. 2020) ........................................................................ 23

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ........................................................................ 29

*Ngethpharat v. State Farm Mut. Auto. Ins. Co.*,
   No. C20-454, 2022 WL 1404526 (W.D. Wash. May 4, 2022)................................ 22

*Prudhomme v. GEICO*,
   No. 21-30157, 2022 WL 510171 (5th Cir. Feb. 21, 2022) ................................ 23, 29

*Richardson v. Progressive Am. Ins. Co.*,
   No. 2:18-cv-715-Ftm-99MRM, 2022 WL 154426 (M.D. Fla. Jan. 18, 2022) ................ 15, 26

*Robinson v. Sheriff of Cook Cnty.*,
   167 F.3d 1155 (7th Cir. 1999) ........................................................................ 27

*Sampson v. USAA*,
   No. 22-30551, 2023 WL 6533181 (5th Cir. Oct. 6, 2023) .......................... 2, 18, 19, 21, 23, 25

*Santiago v. City of Chicago*,
   19 F.4th 1010 (7th Cir. 2021) ....................................................................... 11

*Slade v. Progressive Sec. Ins. Co.*,
   No. 6:11-CV-2164, 2014 WL 6484588 (W.D. La. Oct. 31, 2014), *certification decision vacated* 856 F.3d 408 (5th Cir. 2017)................................ 23, 26

*In re State Farm Fire & Cas. Co.*,
   872 F.3d 567 (8th Cir. 2017) .............................................................. 1, 14, 22, 24

*State v. Bishop*,
   800 N.E.2d 918 (Ind. 2003) ..................................................................... 5, 15

*Stuart v. State Farm Fire & Cas. Co.*,
   910 F.3d 371 (8th Cir. 2018) .............................................................. 2, 23, 24, 26

*Susman v. Lincoln Am. Corp.*,
561 F.2d 86 (7th Cir. 1977) ...................................................................................28

*Tarrify Properties, LLC v. Cuyahoga County*,
37 F.4th 1101 (6th Cir. 2022) ...............................................................................21

*TransUnion LLC v. Ramirez*,
594 U.S. ----, 141 S. Ct. 2190 (2021) ............................................................16, 23

*U.S. Valves, Inc. v. Dray*,
190 F.3d 811 (7th Cir. 1999) .................................................................................16

*Valley Drug Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) .............................................................................28

*Volino v. Progressive Cas. Ins. Co.*,
No. 21 CIV. 6243 (LGS), 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023)
......................................................................................6, 8, 9, 11, 14, 21, 24, 25

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................................................................................11, 12, 16

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................... *passim*

iv

## INTRODUCTION

Plaintiffs Heather Schroeder and Misty Tanner allege that their insurers, Progressive Paloverde Insurance Company and Progressive Southeastern Insurance Company ("Progressive"), breached their insurance policies by paying them less than the pre-loss actual cash value or "ACV" of their totaled vehicles. As the Seventh Circuit and other appellate courts have held (and as Plaintiff Tanner recognizes), this type of case is inapt for class resolution: Where a claim rests on the allegation that class members "received inadequate coverage for their loss," "the class-action device is not appropriate" because the case turns on "highly individualized questions of fact." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). In other words, whether an insurance company's valuation methodology "produce[d] an unreasonable estimate of the actual cash value" of insured property "may only be determined based on all the facts surrounding a particular insured's … loss." *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 577 (8th Cir. 2017) ("*LaBrier*"). Like in *Kartman* and *LaBrier*, Plaintiffs' complaint regarding Progressive's failure to pay them the actual cash value of their insured vehicles rests on inherently individualized questions regarding the value of each vehicle; thus, the class action device is not appropriate.

Underscoring as much, Plaintiff Tanner—one of the two Plaintiffs in this case—does not move for class certification of her claims against her own underwriter, Progressive Southern Insurance Company. *See* Mot. at 1-2 n. 1. That is because Plaintiff Tanner's claim turns on individualized evidence bearing on the value of her totaled vehicle. After Progressive estimated the ACV of Plaintiff Tanner's vehicle using a valuation report from Mitchell International, Inc.'s ("Mitchell") WorkCenter Total Loss ("WCTL") valuation program—which included the Projected Sold Adjustment ("PSA") that is at the center of this case—Plaintiff Tanner negotiated her valuation with Progressive based on individualized factors that had nothing to do with the PSA.

Plaintiff Schroeder ("Plaintiff") attempts to bury this problem by simply declining to have Plaintiff Tanner move for class certification. But Plaintiff cannot ignore what Plaintiff Tanner's facts show about the fundamental problem with her theory: whether Progressive paid an insured the actual cash value of his or her vehicle turns on individualized evidence.

Rather than address these individualized issues, Plaintiff would have the Court focus myopically on the purported propriety of the PSA. This is a false trail. Neither the Policy nor Indiana law bar the use of a PSA (indeed, as Progressive's appraisal expert explains, projecting what a vehicle will actually sell for is an eminently reasonable step to take when determining ACV). The sole question at issue in this case is whether Progressive paid insureds the ACV of their vehicles. "If a given policyholder was fully compensated for the damage … then [the insurer] will have satisfied its contractual obligation *regardless* of" the "standard [used] to assess the damage." *Kartman*, 634 F.3d at 890; *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) ("[B]ecause the contracts did not specify how ACV payments would be calculated, whether [the insurance company] was in breach would depend on whether its methodology produced a reasonable estimate of ACV … in an individual case," a question that many appellate courts have squarely held "c[an]not be answered on a class basis."). As two appellate courts have held, where a claim turns on "looking into the actual pre-accident value of the car" of every putative class member, "common questions do not predominate." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022); *Sampson v. USAA*, No. 22-30551, 2023 WL 6533181, *6 (5th Cir. Oct. 6, 2023).

Far from addressing these individualized issues, Plaintiff's attacks on the PSA only provide further reason for why class certification is improper. For example, Plaintiff complains that, in calculating and applying the PSA, Mitchell "ignored" data and "discarded . . . evidence about

dealer pricing practices." Dkt. 94, Plaintiff's Motion for Class Certification ("Mot."), p. 15. But even if her complaints about the data underpinning the PSA were valid (they are not), there is no dispute that the impact of these purported flaws in the data (if any) would be uneven across the class, meaning liability could not be determined classwide. Similarly, the only evidence Plaintiff offers about dealer pricing practices is that they vary significantly across the industry. While some dealers may refuse to sell vehicles for below list price, others negotiate and frequently sell vehicles for below list price. And Plaintiff's assertion that backing the PSA out of valuations results in an ACV that complies with some "appraisal standards" is not only irrelevant (Progressive is not required to follow any particular "appraisal standard"), it is not supported by any evidence. Plaintiff has not presented a single appraisal standard, and Plaintiff Tanner's own claims show that simply removing the PSA does not result in ACV—even by Plaintiff's own standards.

Thus, not only are disputes over vehicle ACVs ill-suited to class certification, determining whether applying a PSA may have caused any vehicle to be undervalued is a highly individualized inquiry. Plaintiff's Motion for Class Certification should be denied.

## **BACKGROUND**

### I.    **Plaintiffs' Claims Under Their Indiana Insurance Policies with Progressive.**

On February 19, 2019, Schroeder totaled her 2018 Toyota Corolla. *See* Dkt. 59 ¶ 11; Dkt. 1-2. She submitted a claim under her auto insurance policy, and Progressive paid $14,291.69 to Schroeder's lienholder. Ex. A, Schroeder Dep. Ex. 2. Progressive estimated the value of Schroeder's vehicle based on WCTL's analysis of thirteen comparable vehicles that either recently sold or were listed for sale in their area. Dkt. 1-2 at 4; Dkt. 59-2 at 4; *see also* Ex. B, Kroell Dep. Ex. 5 at 10. WCTL adjusted the prices of those vehicles to account for ways in which they differed from the totaled car, such as in mileage and equipment. Ex. C, Kroell Dep. Tr. 143:14-145:3; Ex. D, Bogus Dep. Tr. 37:11-38:11; Ex. E, Kroell Dep. Ex. 7 at 32. Because some of the vehicles were

listed for sale but had not yet sold, WCTL applied an individual PSA to each of those vehicles to estimate what they would sell for. Ex. C, Bogus Dep. Tr. 37:11-38:11 Ex. E, Kroell Dep. Ex. 7 at 32. Schroeder did not dispute this payment or any aspect of the valuation—which was presented to her in a detailed valuation report—at the time of her settlement. In her deposition, however, Schroeder testified that she believed her settlement was too low, in part, because it did not properly account for some of the features her vehicle had. Ex. F, Schroeder Dep. Tr. 48:18-8. She further testified that the sales prices of comparable vehicles in the area would be an appropriate benchmark for determining ACV. *Id.* at 52:21-53:7. Had Progressive relied on only the four sales prices in her report, Schroeder would have been paid less. Dkt. 96-6 at 5.

Plaintiff Tanner totaled her vehicle on July 2, 2020. *See* Dkt. 59 ¶ 12; Dkt. 59-2. Progressive estimated the ACV of the vehicle based on a WCTL report that applied PSAs to eight of the ten comparable vehicles. Unhappy with Progressive's valuation of her vehicle, Tanner contacted Progressive and stated she believed the ACV was too low. Ex. G, Tanner Dep. Tr. 73:11-18. The Progressive adjuster assigned to Tanner's claim re-reviewed her WCTL Report and determined that three of the ten comparable vehicles identified by WCTL had prices that were lower than the other seven. *Id.* at 73:19-15. The adjuster thus manually recalculated the settlement without the three lowest comparable vehicles to offer a new settlement of $7,554.52—an increase of nearly $500 over Progressive's initial offer—which Progressive then paid to Tanner's lienholder. *Id.* at 74:21-76:10.

Plaintiffs claim that Progressive breached its promise in their policies to "pay for sudden, direct, and accidental loss" up to the covered vehicle's ACV. Dkt. 59 ¶¶ 83, 85. Both sides agree that a vehicle's ACV is equivalent to its "market value." Mot. 2; *see also* Dkt. 59-1 at 21 (explaining that a car's "actual cash value is determined by the market value, age, and condition

4

of the vehicle"). Under Indiana law, market value "is the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale." *State v. Bishop*, 800 N.E.2d 918, 923 (Ind. 2003). Because Plaintiffs' vehicles were totaled, there is no way to definitively determine the amount for which they would have sold in their pre-loss condition on an open market. The goal is thus to estimate that sale price.

## II.     PSAs Are Based on Hard Data from Real Transactions.

WCTL aims to estimate sale price, in part, by looking to the market value of similar vehicles nearby. Because sold prices represent vehicles' market values, WCTL uses the sold prices of comparable vehicles whenever available. Ex. E, Kroell Dep. Ex. 7 at 6, 32, 48. Plaintiff does not ask the Court to disregard these prices—on the contrary, she relies on them for her proposed damages model, which accepts all aspects of WCTL other than the PSA, including the use of sold prices. Mot. 20. When WCTL identifies a nearby comparable vehicle listed for sale by a dealer, a PSA is applied to project the sold price—unless the vehicle is listed at a "no haggle" or "one price" dealership. Ex. E, Kroell Dep. Ex. 7 at 32. J.D. Power calculates PSAs based on its analysis of data reflecting advertised and sold prices for used vehicles. Ex. D, Bogus Dep. Tr. 160:3-22. The advertised price data comes from Mitchell's database of advertisements from sources such as Autotrader.com, Cars.com, and Vast.com. The sold price data comes from J.D. Power's Power Information Network ("PIN"), which gathers daily point-of-sale transaction data from ███████████

████████. *Id*. at 22:4-12, 23:1-3; Ex. B, Kroell Dep. Ex. 5 at 4. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ Ex. D, Bogus Dep. Tr. at 97:3-98:23.

████████████████████████████████████████████████████████

████████████████████████████████████████ *Id*. at 41:16-42:14,

61:21-62:17. 

*Id.* at 88:18-89:4.

*Id.* at 136:21-137:14. Before the global pandemic-induced vehicle shortages,

*Id.* at 59:14-18, 63:9-64:18. In 2021,

*Id.* at 37:23-38:1, 91:8-13.

Schroeder argues that J.D. Power's efforts to clean the data "thumbed the scale" and rendered any PSA deduction "invalid." Mot. 10. But the evidence shows that PSAs are, on average, remarkably accurate. Progressive's expert, Dr. Jonathan Walker, analyzed 1,063 transactions in which both list prices and sold prices were available. Ex. H, Walker Rpt. ¶¶ 77. For each, Walker compared the PSA to the actual difference between list price and sold price. *Id.* On average, the sold price projected by the PSA was ███████ of the vehicle's actual sold price. *Id.* ¶ 78. And for ███ of those vehicles, the "PSA *understated* the actual discount off list"—in some cases, by ██ ███████. *Id.* Plaintiff's expert, Dr. Michelle Lacey, likewise acknowledged ████████

Ex. I, Lacey *Volino* Dep. Tr. 88:6-11, 87:1-88:23. Plaintiff presents no evidence on the accuracy of individual PSAs.

## III.    Evidence Regarding the Market for Used Vehicles and the PSA.

The primary "common" assertion underlying Plaintiff's Motion is that the PSA is categorically improper because dealers do not negotiate from list price, so the list price always reflects a vehicle's "true" worth. Mot. 1-3. The evidence proves otherwise.

The testimony from Plaintiff's statistical experts, Dr. Lacey and Jeffrey Martin, only confirm that dealers regularly sell cars for less than list price. According to Dr. Lacey, the data she reviewed showed that more than half of all cars sold for less than list price in 2020 and 2021. *See* Dkt. 93-5, Lacey Rpt. at 4-6. Martin similarly shows that, based on a different data set, somewhere between 31.8% and 44.61% of vehicles sell for less than list price. *See* Dkt. 96-11, Martin Rpt. ¶¶ 27-54. Martin's numbers should, in fact, be much higher because his report relied on the taxable value of vehicle sales instead of sold prices, meaning the values analyzed may have included ancillary dealer fees, warranties, service contracts, or accessories sold with the car. Ex. J, Declaration of John Scheuren ("Scheuren Decl."); *see also* Ex. K, Kuntz Dep. Tr. 86:9-87:25; 98:4-8; Ex. L, Holcomb Dep. Tr. 97:20-98:10.

Plaintiff's "industry" expert, Kirk Felix, admits the same. Felix initially suggested that used car dealers do not negotiate because they use "sophisticated pricing software" to price vehicles "to market"—specifically, vAuto and its competitors. Dkt 49-8, Felix Rpt. at 2-4. But vAuto's creator explained that, for major categories of used vehicles, dealers reject the software's pricing recommendations "roughly 75% of the time" and, on average, list their vehicles roughly $1,000 above the software's recommended list price—leaving ample room for negotiation while still preserving profit expectations. Ex. M, Felix *Bartee* Dep. Tr. 67:14-74:2. All Felix could say in response to that evidence is that "[a] hundred percent of the dealers are not rejecting the [vAuto] pricing." *Id*. Felix has further clarified that he "*never said that there was absolutely no negotiation*," only that the "goal of dealerships" is to increase profitability by reducing negotiated discounts off list price. Ex. N, Felix *Costello* Dep. Tr. 196:7-24 (emphasis added). Some dealers continue to negotiate the prices of used cars, and "different dealers run[] their departments in different ways." Ex. O, Felix *Kroeger* Dep. Tr. 27:4-29:19; 42:14-45:1.

Progressive's expert, Marc Spizzirri, performed market research to show how frequently negotiation occurs in today's market. Ex. P, Spizzirri Rpt. ¶¶ 79-84. In a sample of more than 600 used car dealers, more than 75% were willing to negotiate the price of a used car. *Id*. Spizzirri also investigated the practices of the dealers that vAuto holds out to be "success stories" on its website. *See id.* ¶¶ 82-84; *see also, id.* App'x 3. His research revealed that over 75% of those dealers were willing to sell a used vehicle for less than the advertised price—with most starting at a negotiated discount of $500 or more based on just a phone call or text message. *Id.*

Plaintiff's effort to paint all dealership pricing practices with a single brush not only defies her own experts' testimony but also ignores changes that have occurred in the used-car market over time. Plaintiff seeks to certify a class spanning from May 2012 until present day. Dkt. 97-7, Lacey Rpt. Ex. 2. But Plaintiff's experts testified that the market changed dramatically during that time. *See, e.g.*, Ex. M, Felix *Bartee* Dep. Tr. 79:22-81:14 ("[V]alues are just crazy after COVID."); 86:14-89:2 (calling the post-pandemic market "very unusual"); 131:9-133:9 (noting "constant change" in the used car market); *see also* Ex. Q, Felix *Bartee* Dep. Ex. 10. Indeed, Felix outright admitted that the 2020 global pandemic changed the market. Ex. M, Felix *Bartee* Dep. Tr. 76:6-77:7, 80:12-20. And Dr. Lacey agreed that ████████████████████████████████████████ ████████████████████████████ and that one needs to take that timing into account ████████ ███████████████████████████████████ Ex. I, Lacey *Volino* Dep. Tr. 106:9-21. Unsurprisingly, Mitchell also adjusted its methodology for calculating the PSA during the class period. Ex. D, Bogus Dep. Tr. 37:23-38:1, 91:8-13 (describing refinements to methodology to account for changes).

Also contrary to Plaintiff's insistence, it is not the case that dealers only sell used cars for less than list price due to reasons that "are unrelated to actual cash value." Mot. 7. As one of

Plaintiff's experts explained, whether a car will sell for list price is highly dependent on the particular transaction, *see* Ex. M, Felix *Bartee* Dep. Tr. 137:25-138:18, and one must review the "deal jacket for any given transaction" to understand why the sale price was lower than the list price (something he did not do here). Ex. O, Felix *Kroeger* Dep. Tr. 55:22-57:11. Plaintiff has not produced any evidence to show that sales below list price were due to those reasons. Dkt. 96-8, Felix Rpt. at 6-9.

## IV.    The Varying Approaches to Estimating a Vehicle's Actual Cash Value and Plaintiff's Phantom "Appraisal Standards."

Unable to show the categorical inaccuracy of the PSA or uniformity in the way dealers price and sell cars, Plaintiff rests her argument for class certification on a shortcut: Plaintiff argues that—notwithstanding the varying evidence of market practices with respect to dealer pricing and negotiation—"***the*** way to identify ACV" is by using the "Mitchell method but without the PSA." Mot. 16 (emphasis added). This position ignores the testimony from Plaintiff's own appraisal expert, who was clear that: "there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value." Dkt. 96-9, Merritt Rpt. at 2. There are a variety of methods, tools, books, and products available to estimate ACV that will result in a range of possible ACV estimates. Ex. R, Merritt *Costello* Dep. Tr. 70:19-71:25; *see also* Ex. S, Ryan Dep. Tr. 14:23-15:12; Ex. T, Kinney Rpt. at 3. So, while Merritt contends that the Mitchell valuation methodology without the PSA is *a* sound way to estimate ACV, Dkt. 96-9, Merritt Rpt. at 9, he agrees there are other sound ways, including guidebooks like the National Automobile Dealers Association ("NADA") Guide and the Kelley BlueBook ("KBB"), to do so. Ex. U, Merritt *Volino* Dep. Tr. 68:17-69:7.

There is also no dispute that used cars are unique. According to Plaintiff's expert Felix, the pricing tools that dealers use to determine list prices provide a "range" of prices for individual used

cars "because every used car is different." *See* Dkt. 93-6, Felix Rpt. at 4; Ex. V, Felix *Drummond* Dep. Tr. 68:11-70:12. Variations in mileage, options, car history reports, and even color can result in different sale prices. *Id.* at 70:5-12. A car that is burnt orange, for example, might be worth less than a white car. *Id.* at 70:16-71:1. Plaintiff's WCTL reports bear this out. The report identified 13 comparable vehicles. Dkt. 1-2 at 4. After adjusting their prices to account for differences (like mileage and equipment), none had the exact same value; the values spanned a range of more than $1,200. *Id.* at 4, 6-12.

Because each vehicle is unique and because reasonable appraisers could reach different conclusions as to the value of a vehicle, Merritt concedes that the proper way to determine whether an ACV estimate is correct is to compare the estimate "with other appraisals." Ex. W, Merritt *Drummond* Dep. Tr. 17:7-17. In this case, however, neither Merritt nor any other expert has conducted an individual appraisal of Plaintiff's vehicle to determine whether Progressive underpaid her claim. And Merritt admits that if he—or another appraiser—had done an appraisal "starting from scratch," it would be "unlikely" that he would have used the same inputs for his appraisal that Mitchell used. Dkt. 96-9, Merritt Rpt. at 7 ("[I]t is unlikely that I would have … selected the exact comparable vehicles used in the report."). Progressive, on the other hand, has introduced evidence showing that WCTL valuations regularly exceed valuations by NADA. *See* Ex. X, Declaration of Stephen Hover ("Hover Decl.") ¶¶ 54, 58.

Plaintiff attempts to avoid the individualized nature of estimating ACV by arguing that Progressive's process was inappropriate because the PSA purportedly violates "appraisal standards." *See* Mot. 6-7, 15-16. But a "process" error does not trigger liability unless Plaintiff actually received less than ACV. And Merritt does not opine that a downward adjustment to account for a dealer's willingness to negotiate is inherently improper. Just the opposite, he is clear

that a downward adjustment (like the PSA) is appropriate where a dealer will, in fact, "take a specified cash price … for that particular comparable vehicle." Dkt. 96-9, Merritt Rpt. at 6. Merritt never verified the sale prices of any of the comparable vehicles in Plaintiff's report and thus has no basis to determine whether the PSAs resulted in an improper valuation or appropriately captured actual dealer behavior. *Id.* at 5, 6; Ex. U, Merritt *Volino* Dep. Tr. 123:24-124:22 ("That is your best data if you can get the sold price.").[1]

## ARGUMENT

Plaintiff bears the burden to prove her putative classes meet Rule 23's certification requirements. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022). This Court must conduct "a rigorous analysis" of the Rule 23(a) and Rule 23(b)(3)'s requirements: numerosity, commonality, typicality, adequacy, predominance, and superiority. *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021). That analysis often "entail[s] some overlap with the merits" of the claim, as "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). The Court's rigorous analysis should focus on the elements of the claims. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). A rigorous analysis, binding precedent, and plain common sense reveal that Plaintiff cannot satisfy her burden to prove that her

---

[1] In any event, Merritt's opinions should be afforded little weight because he has not identified any "appraisal standards" that are inconsistent with the application of the PSA. Ex. R, Merritt *Costello* Dep. Tr. 23:12-14 ("Q. Are there any written standards on which you rely for purposes of conducting appraisals? A. No."). Though the Court need not consider them to deny Plaintiff's motion, it is notable that the only written appraisal standards produced in this case—the American Society of Appraisers' Monographs and The Appraisal Foundation's Uniform Standards of Appraisal Practice—clearly state: "Using the Sales Comparison Approach requires the appraiser to distinguish between prices asked and prices realized." Ex. T, Kinney Rpt. at 5 (emphasis added); *see also id.* at 5-6 (Progressive's appraisal expert, a former co-chair of the Automotive Group of the American Society of Appraisers, explaining that written appraisal standards uniformly recognize sold prices as the best indicator of value, and projecting a comparable vehicle's sold price is proper).

class is certifiable because liability on the underlying claims turns on the values of thousands of unique used cars.

## I. Plaintiff's Superficially Common Questions are Not Common at All.

To satisfy commonality, Plaintiff must show that the questions will "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. Commonality is thus not whether a complaint "literally raises common 'questions'"; rather it "requires the plaintiff[s] to demonstrate that the . . . members 'have suffered the same injury.'" *Id.* at 349-50; *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012). Plaintiff identifies two "common" questions: "(1) whether the PSA deduction is baseless and invalid" and (2) whether "the invalid PSA deduction must be excised from insureds' valuation reports to arrive at a proper ACV amount." Mot. 14. The evidence shows that neither question can yield a common answer.

### A. Many used car dealers sell cars for below the advertised list price.

Plaintiff claims that she will show that the PSA is categorically "invalid" for all class members because dealers price vehicles to market and do not negotiate, so a vehicle's "list price equates to [its] market value." Mot. 10. To make this argument, Plaintiff relies exclusively on her experts' opinions, but her experts' testimony squarely contradicts this sweeping assertion. According to Plaintiff's experts, dealerships vary in how they price vehicles; some dealers negotiate prices; vehicles frequently sell for less than list price; and it is appropriate to adjust list prices to account for the difference between an advertised price and the sale price. For example:

- According to Dr. Lacey, more than half of all cars sold for less than list price in 2020 and 2021. Dkt. 93-5, Lacey Rpt. at 4-6.

- According to Martin, data from Texas, Ohio, and Virginia showed that a significant percentage of vehicles sell for less than list price—up to 44.61%. Dkt. 96-11, Martin Rpt. ¶¶ 27, 34, 41, 48.

- According to Felix, he "never said that there was absolutely no negotiation," only that the "goal of dealerships is to drive the difference" between list and sales price to zero. Ex. N, Felix *Costello* Dep. Tr. 196:7-24.

- Felix also recognized that not all dealers use pricing software and that even among those who do, many choose to advertise at prices above what the software recommends. Ex. M, Felix *Bartee* Dep. Tr. 68:8-73:19; *see also id.* at 76:6-14.

- According to Merritt, appraisers can properly make downward adjustments if a dealer would sell a car for less than list price. Dkt. 96-9, Merritt Rpt. at 6.

This evidence not only directly undercuts Plaintiff's claim on the merits, it demonstrates that whether a particular PSA resulted in Progressive paying the ACV of a vehicle is an inherently individualized question. Put differently, Plaintiff's evidence—at best—mandates different outcomes for different class members. The question for commonality is not whether Plaintiff has mustered some common evidence but whether that evidence can generate common answers. *Wal-Mart*, 564 U.S. at 350; *cf. Lara*, 25 F.4th at 1140 (noting that "[s]ome relevant evidence could be in common, but much of it wouldn't be").

Considering this evidence, Plaintiff cannot prove in a single stroke that every PSA adjustment for every comparable vehicle used in valuing every class member's car was improper or invalid. Indeed, whether one input for the WCTL system was "statistically flawed" is precisely the sort of superficial common question that has been rejected by the Seventh Circuit. *Jamie S.*, 668 F.3d at 497. While there may be instances when a price projected by a PSA underpredicted the actual sales price of a comparable vehicle, there is no evidence that this was true in *every* case, and no way to identify those instances based on the evidence on which Plaintiff relies for purposes of class certification.

Plaintiff also halfheartedly argues commonality by contending that the data used to calculate the PSA is invalid. But the data varies for vehicles and changes over time. *Supra* at 6-8. For an individual insured to show that a particular PSA was based on "flawed" data, they would

13

need to present individualized evidence about the statistics making up that PSA, something Plaintiff has not done for any PSA, let alone all. And even if the data were flawed, such flaws could result in overpayment. As Plaintiff's expert, Dr. Lacey, admitted, █████████████

███████████████████████████████████████████████████████████

████████████████████████████ Ex. I, Lacey *Volino* Dep. Tr. 88:6-11.

**B.     Whether removing the Projected Sold Adjustment from a WCTL report results in Actual Cash Value cannot be resolved with common evidence.**

Plaintiff proposes that a jury could determine "a proper ACV amount" by subtracting the amount of the PSAs applied in each WCTL report for every insured. Mot. 14, 18-19. That proposal, however, is based on Merritt's unreliable expert testimony which cannot stand up to even the slightest scrutiny. Even if Plaintiff could show that the PSA is "invalid" on a classwide basis, that still would not mean that the ACV of a given class member's vehicle could be calculated simply by removing the PSA from the vehicle's WCTL valuation.

Assuming the WCTL valuation without the PSA is one valid way to estimate ACV, Plaintiff cannot prove—and has not even tried to prove—that it is the only valid way to estimate ACV. As Plaintiff's experts agree, there are multiple valid methods of estimating ACV. And because Progressive did not promise to use any particular method, all of those methods are relevant to determine whether Progressive breached its obligation to pay ACV. A jury would therefore need to consider each unique vehicle and weigh the "[c]onflicting estimates" provided by (for example) WCTL, NADA, KBB, and any other appraisals or valuation methods Plaintiff or Progressive might offer into evidence. *LaBrier*, 872 F.3d at 574; *see also Kartman*, 634 F.3d at 886, 888 (noting the requirements for class certification under Rule 23(b)(3) were not met when "each plaintiff's claim of underpayment required individualized determination on the merits"); *Lara*, 25 F.4th at 1139 ("[F]iguring out whether each individual putative class member was harmed would involve an

14

inquiry specific to that person … [I]t would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered.").

Moreover, despite superficially contending that the WCTL method without the PSA is a valid method of estimating ACV, Merritt admits that he does not claim to have any familiarity with WCTL, does not know how the PSA is calculated, and did not do any work to verify whether WCTL reports otherwise reflect an accurate estimate of ACV. Ex. W, Merritt *Drummond* Dep. Tr. 148:6-152:19 (testifying that the only thing he did was "just review[] [the vehicle valuation reports and] tr[y] to do the best appraisal [he] could do"). Merritt testified it would be "foolish" to assume that every aspect of WCTL is accurate and further agreed that assessing the accuracy of the ACV amount reached in a report would require an appraisal of the vehicle. Ex. Y, Merritt *Kroeger* Dep. Tr. 82:21-83:8. Yet he did not appraise Plaintiff's vehicle, or any vehicle in the putative class; he simply assumes that WCTL reports minus PSAs accurately reflects ACV.

Instead, Merritt's opinion is premised on his blanket assertion that the PSA violates "appraisal standards." But neither the policy at issue nor Indiana law requires Progressive to comply with any particular "appraisal standard." *See Kartman*, 634 F.3d at 890 ("Insurance entails a promise to pay covered losses, not a covenant to use a particular standard for evaluating property damage."). They simply require an adequate payment of ACV. So even if the PSA violated some appraisal standard, that would "not … prove that the putative class members were underpaid." *Richardson v. Progressive Am. Ins. Co.*, No. 2:18-cv-715-Ftm-99MRM, 2022 WL 154426, at *23 (M.D. Fla. Jan. 18, 2022) (denying class certification); *Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-PRW, 2020 WL 2461482, at *3 (W.D. Okla. May 12, 2020) (denying class certification for lack of commonality in case challenging identical valuation methodology). Proving underpayment would require evidence of "the price at which property would change hands

15

between a willing buyer and seller." *Bishop*, 800 N.E.2d at 923. Merritt's conclusory assertions about appraisal standards have no bearing on that issue.

Even if appraisal standards were relevant, Merritt fails to identify a single rule, standard, or guideline on which his opinion is based. *See generally* Dkt. 96-9, Merritt Rpt. Merritt is not familiar with widely accepted standards, including the Uniform Standards of Professional Appraisal Practice or American Society of Appraisers Monograph 7, which instruct that "actual realized prices in the relevant market are more reliable indicators of value than asking prices." Ex. R, Merritt *Costello* Dep. Tr. 51:20-52:19. And Merritt admits that he does not have any idea how the PSA is calculated or on what data it is based. Ex. W, Merritt *Drummond* Dep. Tr. 18:1-22 ("Q. Okay. What is the projected sold adjustment, or PSA? A. … It is a valuation, I believe, that some of those reports place on a vehicle. I'm not really sure how they come up with that.").

In sum, the fact that Plaintiff has posed what appears to be, on its face, a "common" question regarding removal of PSAs from WCTL reports is not a basis to certify a class under Rule 23 because it cannot generate common answers for the entire class on the key liability issue of whether any insured was paid less than actual cash value. *Wal-Mart*, 564 U.S. at 350-51 ("[A]ny competently crafted class complaint literally raises common questions.").

## II.   Individualized Issues Predominate and Foreclose Class Certification.

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc.*, 563 U.S. at 809. Under Indiana law, the elements of a breach of contract action are "the existence of a contract, the defendant's breach thereof, and damages" incurred as a result of the breach, as well as Article III standing. *U.S. Valves, Inc. v. Dray*, 190 F.3d 811, 814 (7th Cir. 1999); *see also TransUnion LLC v. Ramirez*, 594 U.S. ----, 141 S. Ct. 2190, 2208 (2021). To prove her claim for breach of the duty of good faith and fair dealing, Plaintiff must again show standing, and that

16

Progressive either "(1) ma[de] an unfounded refusal to pay policy proceeds; (2) caus[ed] an unfounded delay in making payment; (3) deceiv[ed] the insured; [or] (4) exercise[ed] any unfair advantage to pressure an insured into settlement of his [or her] claim." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). Plaintiff relies on the same arguments and evidence to support both claims. *See* Mot. 17. The only contract term Plaintiff invokes is the obligation to pay each class member up to the ACV of her car in the event of a total loss. Dkt. 59 ¶¶ 2, 65, 74, 83.

### A.    Whether Progressive paid each insured less than Actual Cash Value is an individualized issue that predominates over all others.

The central question for standing, breach, and damages is whether Progressive paid Plaintiff (and each putative class member) less than her vehicle's ACV. *Lara*, 25 F.4th at 1139 ("[I]f a putative class member was given [ACV] or more, then he or she cannot win on the merits."). Plaintiff's primary argument is not that Progressive universally underpaid class members but rather that Progressive used a purportedly flawed methodology in determining payment. *See* Mot. 14. That is, Plaintiff contends that application of a PSA inherently means Progressive is not calculating "market value" even if it results in a higher value than other methods. *See* Mot. 14.

The Seventh Circuit, however, has rejected the argument that a purported methodological flaw—divorced from actual underpayment—can satisfy predominance under Rule 23. In *Kartman*, a putative class of several thousand State Farm insureds sued State Farm for breach of contract and bad-faith denial of insurance benefits, claiming that State Farm failed to use an appropriate methodology and thus underpaid them. 634 F.3d at 889. The district court declined to certify a Rule 23(b)(3) damages class, "holding that each plaintiff's claim of underpayment required an individualized factual inquiry on the merits." *Id.* at 886. The Seventh Circuit agreed. *Id.* at 889. While denying certification of the Rule 23(b)(3) class, the district court allowed a class claim for injunctive relief to proceed. *Id.* The Seventh Circuit reversed that holding, explaining: "State Farm

had a contractual obligation to pay policy holders" for their loss, but there was "no contract or tort-based duty requiring the insurer to use a particular standard for assessing" that loss. *Id.* at 886. In other words, alleged underpayment "is a cognizable wrong in both contract and tort, but the *method* [an insurer] uses to adjust claims is not independently actionable." *Id.* at 890 (emphasis added). "If a given policyholder was fully compensated for the damage …, then [the insurance company] will have satisfied its contractual obligation regardless of whether it used a 'uniform and objective' *or* an ad hoc standard to assess the damage." *Id.* at 890. This instruction is fatal to Plaintiff's bid for class certification here. At the end of the day, it is Plaintiff's burden to prove breach and damage, and she cannot do that merely by contending that Progressive failed to use her preferred valuation methodology. *Id.* at 890, 894; *see also Sampson*, 2023 WL 6533181, *5-6 (reversing certification because plaintiff must show injury on a classwide basis); *Lara*, 25 F.4th at 1140 (affirming denial of certification because even if plaintiffs could show that the challenged adjustment were "illegal," "figuring out whether each plaintiff was injured would be an individualized process").

Nor can Plaintiff satisfy predominance by arguing that her expert "will testify that the way to identify ACV" is to use "the Mitchell method but without the PSA," Mot. 16. As an initial matter, Merritt never says that applying the Mitchell method without the PSA is "the" way to identify ACV, only that it is one of multiple acceptable methods of estimating ACV. *See* Dkt. 96-9, Merritt Rpt. at 2, 7, 9; Ex. W, Merritt *Drummond* Dep. Tr. 17:7-17 (testifying that the best way to ascertain ACV for a given vehicle is to consider multiple estimates of ACV). Further, nothing in the policy or Indiana law requires Progressive to use Merritt's methodology. *Cf. Kartman*, 634 F.3d at 893 ("Simply put, State Farm had no independent duty—whether sounding in contract or tort—to use a particular method to evaluate hail-damage claims"). So, in the words of the Fifth

Circuit, even if Merritt's methodology "is a legally permissible method of determining ACV …,
it would follow that" other values like NADA, "KBB values (and Edmunds, etc.) can also be
treated as proof of ACV," which "creates an explosion of predominance issues because [an
insurance company] has the due process right to argue, for each individual plaintiff, that damages
should be determined by a different legally permissible method that would produce lower damages
… (or no damages at all)." *Sampson*, 2023 WL 6533181, *4-6; *Lara*, 25 F.4th at 1140 (while
Plaintiff may have some common "relevant evidence" about alleged underpayment in the form of
the "amount of the deduction," much of the valuation evidence "wouldn't be" common); *cf. Gorss
Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022) (predominance of
individual issues necessary to decide a defense may preclude class certification).

Plaintiff Tanner's claim illustrates this point. Plaintiff Tanner individually negotiated an
agreement on her totaled vehicle's ACV. If her claim were to go to trial, the jury would need to
consider both the propriety of the PSA and the other individualized issues that culminated in her
vehicle valuation. Plaintiff would have this Court simply toss those individualized issues out the
window in pursuit of class certification. But both binding precedent in *Kartman* and the Due
Process Clause (as explained in *Sampson*) bar this approach.

Here, the evidence shows that other values (like NADA or KBB) will often show that
Progressive paid an insured the actual cash value of his or her car. *See supra* pp. 9-11. Indeed, in
one sample claim from the putative class members in this case, Progressive's WCTL valuation
was over $2,500 higher than the NADA valuation for the same vehicle. Ex. X, Hover Decl. ¶ 54.
This is in line with evidence introduced by Progressive that in another state's sample, WCTL
yielded higher valuations than NADA approximately 30% of the time. *Id.* ¶ 60. Moreover, as Felix
testified, each individual vehicle is unique. In some cases—*i.e.*, for an older or rare vehicle—the

jury may determine that an independent appraisal reflects the best estimate of ACV whereas a nearly new car may be better assessed by another methodology or even a bill of sale.

Progressive would also be entitled to present individualized evidence showing that a purportedly "invalid" PSA did not result in underpayment because other parts of the valuation overvalued the vehicle. For example, in 8 claims out of a sample of 150 during the class period, Progressive had to estimate the mileage of the loss vehicle because the odometer was inaccessible or not functioning. Ex. X, Hover Decl. ¶¶ 51-52. But mileage inaccuracies are just the start. In other instances, Progressive may be unable to inspect the vehicle in-person, or cannot inspect certain parts of the vehicle for condition, and instead, applies a "typical" rating of "3-Good" (and no downward adjustment) even if the actual condition was far worse. *Id.* ¶¶ 47-50. In one claim, for example, the loss vehicle was stolen and set on fire, which caused extensive fire damage. *Id.* ¶ 50. Progressive eventually recovered the vehicle but was only able to inspect the engine and tires due to the fire. *Id.* As a result, the Progressive inspector rated every other vehicle component a "3" or "typical," regardless of its actual condition. *Id.* In at least 2 claims from the sample, Progressive removed the negative condition adjustments entirely where a title-history adjustment was applied instead, providing additional benefit to those policyholders that can often dwarf the average PSA applied in their report. *Id.* ¶¶ 43, 63.

Progressive may further present evidence that even if it undervalued a particular vehicle, the undervaluation did not result in a redressable injury to the policyholder. In some cases, the insured contests their valuation and Progressive will make additional payments or adjustments to the WCTL value to settle the claim. *See, e.g.*, *id*. ¶¶ 17-27. Moreover, because Plaintiff's proposed class includes not only insureds who received compensation from Progressive, but all who made a first-party claim, regardless of whether they received compensation from Progressive or not, it

would include some insureds who are not entitled to compensation at all. As another court recognized, such a broad definition creates "an Article III standing problem for the class." *Volino v. Progressive Cas. Ins. Co.*, No. 21 CIV. 6243 (LGS), 2023 WL 2532836, at *10 (S.D.N.Y. Mar. 16, 2023) (certifying a narrow class that excluded all individuals who did not "receive compensation" from Progressive). Here, a review of the 150 claim files produced in this case revealed that 45 insureds did not receive compensation from Progressive because the entire settlement payment was sent to their lienholder. Ex. X, Hover Decl. ¶ 28. In another sample claim, Progressive did not pay anything to the insured because the vehicle was leased, not owned. *Id.* ¶ 29. In 26 of the sampled claims, the insured did not receive payment because they were not the registered owner of the vehicle. *Id.* ¶ 30. And in 13 of the sampled claims, the insured retained GAP coverage (sometimes through Progressive) to cover the difference between the amount paid by insurance and the amount owed to a lienholder, meaning that the PSA may have had no impact on these insureds whatsoever. *Id.* ¶¶ 35-40. Without a redressable injury or damages, these putative class members cannot establish liability and lack constitutional standing to proceed.

Because individualized questions inherently arise in cases turning on the value of individual pieces of property, courts repeatedly determine that they are inapt for class resolution. Just last year, the Sixth Circuit affirmed the denial of class certification because of the "individualized, fact-intensive, and adversarial process" necessary "to determine the fair market value for each property." *Tarrify Properties, LLC v. Cuyahoga County, Ohio*, 37 F.4th 1101, 1106 (6th Cir. 2022). The Fifth, Eighth, and Ninth Circuits have reached the same conclusion: class certification is improper in valuation cases because of the inherently individualized factfinding required to ascertain the value of insured property. *Sampson*, 2023 WL 6533181, at *5-6 (reversing class certification because the plaintiffs could not prove underpayment on a classwide basis with

their damages model without showing that the damages model was the only way to determine ACV); *Lara*, 25 F.4th at 1139 (affirming the denial of class certification because "whether each individual putative class member was harmed would involve an inquiry specific to that person," involving "looking into the actual pre-accident value of the car and then comparing that with what each person was offered"); *LaBrier*, 872 F.3d at 577 (reversing class certification because while it was possible that "use of the . . . methodology would produce an unreasonable estimate of the [ACV] of" some losses, the "issue may only be determined based on all the facts surrounding a particular insured's partial loss"). And numerous district courts have also agreed in cases that raise practically the same claims and issues involved here. *See, e.g.*, *Curtis*, 2020 WL 2461482, at *3 ("[W]hether Progressive's use of the WCTL violated law or contract will not result in a common answer for the purported class, and will require an in-depth look at specific claims, which contravenes the purpose of class litigation."); *Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20-454, 2022 WL 1404526, *3-5 (W.D. Wash. May 4, 2022) (denying class certification because "Plaintiffs bear the burden of providing evidence that what State Farm offered is less than the [actual cash value] for each loss vehicle"); *cf. Hansen v. Country Mut. Ins. Co.*, No. 18 C 244, 2023 WL 6291629, at *29 (N.D. Ill. Sept. 25, 2023) (denying class certification because a class action device is "not appropriate for resolving … highly individualized questions of fact" like whether class members were "underpaid" in the "insurance context").

Accordingly, the jury cannot conclude that Progressive paid any class member less than the ACV of that class member's vehicle simply by finding that "the PSA is invalid." Mot. 16. Rather, for each vehicle, the jury will need to consider Plaintiff's proposed value, the Mitchell value, any other appraisal value (like NADA or KBB values) that is introduced by either party,

and the individualized features of each vehicle and vehicle report to determine whether the amount Progressive paid for that particular vehicle reflects a reasonable estimate of ACV.

Rather than addressing these factual and legal deficiencies, Plaintiff cites a litany of cases that largely underscore why predominance cannot be satisfied here. Plaintiff cites the *Sampson* district court decision, for example, to support her claim that certification is appropriate for a class like this one. Mot. 20 (citing *Sampson v. United Services Auto. Assn*, 2022 WL 1415652, at *8 (W.D. La. May 3, 2022)). But the Fifth Circuit reversed that certification order, holding that common questions do not predominate in a case that (as Plaintiff's own description of it proves) is indistinguishable for Rule 23 purposes. *Sampson*, 2023 WL 6533181, at *6. Plaintiff also relies heavily on the Eighth Circuit's decision in *Stuart. See* Mot. 21-23. But far from supporting Plaintiff's position, *Stuart* confirms that no class can be certified. In *Stuart*, unlike here, "plaintiffs' contracts *specified the method* for calculating ACV payments," which State Farm allegedly failed to follow. 910 F.3d at 376 (emphasis added). Where, as in *Stuart*, the element of breach can be resolved classwide simply by "calculat[ing] the ACV payment" for each class member "in accordance with [a] prescribed formula," some courts have certified classes, particularly in decisions rendered before the Supreme Court's standing decision in *TransUnion. Id.*; *see also, e.g.*, *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452 (6th Cir. 2020); *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700 (5th Cir. 2020); *but see Prudhomme v. GEICO*, No. 21-30157, 2022 WL 510171 (5th Cir. Feb. 21, 2022) (denying certification in a methodology case because the class included some who benefitted from the allegedly unlawful method); *Lewis v. GEICO*, No. 22-8055

23

(3d Cir. Dec. 22, 2022), ECF No. 21-1 (granting Rule 23(f) petition to address certification of methodology claims in light of *TransUnion*) (Ex. BB).[2]

But the *Stuart* court, like other appellate courts, has recognized that class certification is not appropriate in cases, like this one, where the insurer was not required by law or contract to use a specific "methodology" or "prescribed formula" to calculate ACV. *Stuart*, 910 F.3d at 376. In *Stuart,* the Eighth Circuit distinguished *LaBrier* by explaining that there, class certification was inappropriate "because the contracts did not specify how ACV payments would be calculated," which meant that "whether State Farm was in breach would depend on whether its methodology produced a reasonable estimate of ACV . . . in an individual case," a "question [that] could not be answered on a class basis." *Id.*; *see also Hicks*, 965 F.3d at 462 (the Sixth Circuit explaining that the key distinction between *LaBrier* and *Stuart* was that in *LaBrier*, "different methods could be used to estimate the fair market value . . . and the policies at issue in *LaBrier* did not specify which should be used" (quotation marks omitted)). That reasoning applies with equal force here. Because Plaintiff's policy does not specify how ACV or market value would be calculated, whether Progressive was in breach depends only on whether its methodology produced a reasonable estimate of ACV in an individual case. "[B]ecause this question c[an]not be answered on a class basis, certification under Rule 23(b)(3) [is] inappropriate." *Stuart*, 910 F.3d at 376.

Finally, Plaintiff seeks support in three out-of-circuit district court decisions, but they do

---

[2] *See also, e.g.*, *Slade v. Progressive Sec. Ins. Co.*, No. 6:11-CV-2164, 2014 WL 6484588, *8 (W.D. La. Oct. 31, 2014) (certifying class where Louisiana law allegedly required applying a different methodology), *certification decision vacated* 856 F.3d 408 (5th Cir. 2017); *Lewis v. GEICO*, No. 18-5111 (RBK/MJS), 2022 WL 819611, *9-10 (D.N.J. Mar. 18, 2022) (certifying class where the issue was whether GEICO breached its policies and New Jersey law by "applying condition adjustments without itemizing or explaining them"); *see also Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 740 n.7 (5th Cir. 2023) (affirming class certification but noting that GEICO did not argue to the district court that class members had already received ACV and thus forfeited that argument).

not change the analysis. Take the first decision, *Volino.* Setting aside the fact that the plaintiffs there pursued a different class definition, *see* 2023 WL 2532836, at *10, *Volino*—like the two other recent district court decisions that followed—is unpersuasive and irreconcilable with controlling Seventh Circuit precedent. The *Volino* court certified the class by deferring to the plaintiffs' bare allegation that resolution of their claims turned on whether "applying the PSA was a legitimate methodology" and did "not depend" on whether any individual PSA was accurate. *Id.* at *8[3]; *see also* Order, *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-00175-TCB (N.D. Ga. Aug. 3, 2023), ECF No. 109 at 22 (Ex. CC) (same)[4]; *Drummond v. Progressive Specialty Ins. Co.*, No. 5:21-cv-04479-EGS, 2023 WL 5181596, *10 (E.D. Pa. Aug. 11, 2023) (finding predominance based on the reasoning that plaintiffs' contention that PSAs "misrepresent current market behavior" is "the center of this action," as opposed to "the individual projected sale price of each vehicle"). But courts cannot certify classes based on allegations alone. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (Rule 23 is no "mere pleading standard," but instead demands "evidentiary proof"). The legal claims in this case do not hinge on whether an adjustment is "legitimate," but rather, on whether Progressive paid an insured less than the ACV of their vehicle.

Plaintiff's lawsuit is a valuation case, like *Kartman.* Plaintiff does not claim that Progressive is required by law or contract to use Plaintiff's particular methodology to estimate the ACV of totaled vehicles. Rather, Plaintiff can establish liability only by showing that she was paid less than the value of her car. Mot. 22. So long as Progressive paid an amount within or exceeding the acceptable range of ACV, Plaintiff "cannot win on the merits." *Lara*, 25 F.4th at 1139. Further,

---

[3] At minimum, if this Court were to certify a class, it should narrow the class definition—just as the *Volino* court did—to encompass only those who received compensation from Progressive and can demonstrate standing to pursue their claims.

[4] Underscoring the flaws in these decisions, the *Brown* order relied on the now-reversed certification order in *Sampson* to find predominance. *Id.* at 24.

Progressive has a "due process right" to introduce individualized evidence showing that it paid an adequate amount for each vehicle. *Sampson*, 2023 WL 6533181, *6. Because the value of each used car is an individualized issue and predominates all others, class certification must be denied.

> **B.    Determining damages for any injured class member also requires individualized inquires.**

The individualized issues affecting liability would also spill over into calculating damages. Plaintiff contends that each class member's damages can be determined by a simple calculation: "the total amount of the PSA deductions, divided by the number of comparable vehicles utilized . . . plus prejudgment interest." Mot. 19. This model, however, ignores that Plaintiff must prove how much below ACV Progressive paid each class member. Even if the PSA data were flawed, "statistically invalid . . . adjustments do not indicate that class members would be entitled to a refund of the full negative . . . adjustment." *See Richardson*, 2022 WL 154426, at *22.

Plaintiff relies on *Slade* to claim that her damages model fits her theory, Mot. 20-21, but she overlooks that the *Slade* plaintiffs' damages model and claims were entirely different. In *Slade*, the plaintiffs claimed that defendant was required by law to use either NADA or KBB "base values" for class members' vehicles, and they proposed calculating damages by substituting those values for the allegedly unlawful base values that had been used. 856 F.3d at 411. In other words, *Slade* was a case like *Stuart* where plaintiffs alleged that defendant's "obligation … was not merely to arrive at a 'reasonable' estimate of [ACV], but to calculate the ACV payment in accordance with a prescribed formula." 910 F.3d at 376. This is not so here.

Plaintiff finally cites cases concluding that damages questions do not undermine predominance where liability questions are common. Mot. 18-22. But here, both liability and damages turn on individualized evidence. Where contracts do "not specify how ACV payments would be calculated," whether defendant breached those contracts "depend[s] on whether [the]

26

methodology produced a reasonable estimate of ACV . . . in an individual case," a question that cannot "be answer[ed] on a class basis." *Stuart,* 910 F.3d at 376; *see also Kartman,* 634 F.3d at 889. Ascertaining damages by finding the value of each car will overwhelm any common issues.

## III.  Plaintiff Is an Atypical and Inadequate Class Representative.

Plaintiff has failed to establish that she is a typical and adequate class representative. The Seventh Circuit has explained that, in many cases, these two requirements "merge." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). Where a class representative "is subject to a defense that couldn't be sustained against other class members," certification is improper. *Id.* at 725.[5] Here, the evidence shows that Schroeder was adequately paid. Progressive's payment did not fully account for storage fees, which accrued to Schroeder's benefit in an amount of over $100. Further, Progressive had already paid Schroeder $1,749.23 for damage to her vehicle, which she had not repaired, yet Progressive deducted only $1,244.56 for that damage when valuing the vehicle—yielding a benefit exceeding $500 to Schroeder. In other words, even if Plaintiff's theory about the PSA were right (it is not), the facts show that Progressive still paid Schroeder an adequate amount. *See* Dkt. 59 ¶ 52 (alleging that Schroeder should have been paid approximately $600 more); s*ee also Robinson v. Sheriff of Cook Cnty.*, 167 F.3d 1155, 1157 (7th Cir. 1999) (calling the fact that "the class representative's claim is extremely weak" "an independent reason to doubt the adequacy of his representation"). These individual, fact-specific issues not only establish that Plaintiff Schroeder (and Plaintiff Tanner) are atypical but are

---

[5] Although Plaintiff Tanner's complaint set forth class claims, she has not moved for class certification—presumably because she is neither an adequate nor typical representative of the class. *See* Ex. G, Tanner Dep. Tr. 77:2-79:5 (Progressive's payment was not based on the WCTL report but rather on manual adjustments made by a Progressive adjuster); Dkt. 93-5 at 32 (defining putative class to include insureds whose "claim payment" was based "on an Instant Report"); *Conrad v. Boiron, Inc.*, 869 F.3d 536, (7th Cir. 2017) ("[T]o be an adequate representative, the named plaintiff must be part of the class").

illustrate the numerous individualized issues that would necessarily arise for each class member. *CE Design Ltd.*, 637 F.3d at 726 ("The presence of even an arguable defense peculiar to the named plaintiff … may destroy the required typicality of the class" and "bring into question the adequacy of the named plaintiff's representation.").

A named plaintiff is also inadequate if she "cannot adequately protect the class" because her "interests are antagonistic to or in conflict with the objectives of those [s]he purports to represent." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Proc.* § 1769, at 326 (2d ed. 1986)). "Strict oversight is necessitated since due process requires that absent class members be adequately represented in order to be bound by a court's judgment." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). To try to ease class certification, Plaintiff has chosen to jeopardize the rights of putative class members by focusing exclusively on the PSA and accepting all other parts of the WCTL methodology. Many putative class members will be unable to show that the PSAs in their report were inaccurate and thus will lose on their contract claims as styled by Plaintiff, and that will be true even if those insureds were paid less than ACV due to some other aspect of their valuation or settlement. Plaintiff's willingness to sacrifice these putative class members' viable claims to obtain class certification demonstrates that her interests are "not aligned with those of the class." *Clark v. Experian Info. Sols., Inc.*, No. Civ.A.8:00-1217-24, 2001 WL 1946329, at *4 (D.S.C. March 19, 2001).

Further, a fundamental conflict exists because "some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co.*, 350 F.3d at 1189. The proposed class here encompasses individuals who benefitted from Progressive's ACV calculation. *See, e.g.*, Ex. H, Walker Rpt. ¶ 39. Had Progressive abided by Plaintiff's no-PSA

28

rule and used a different (Plaintiff's-expert-approved) methodology, such as NADA or KBB, a portion of the class could have been paid less. *Id.* ¶ 40. Plaintiff cannot adequately represent a class of insureds with diametrically opposed interests. *Prudhomme*, 2022 WL 510171, at *1. Where the named plaintiffs challenge a methodology that yielded higher valuations than other non-challenged, acceptable methodologies for part of the class, adequacy is "doomed." *Id.*

## IV.    Class Treatment is Not Superior and the Class Is Not Ascertainable.

Because a trial here would inevitably devolve into thousands of mini trials to "adjudicate[e] issues specific to each class member's claim," *Lara*, 25 F.4th at 1140, none of the superiority factors listed in Rule 23 favors certification. Fed. R. Civ. P. 23(b)(3). Class members have an interest in controlling their individual actions to pursue their most valuable claims. These disputes are not minor; some condition adjustments dwarf the PSA. Moreover, Indiana policyholders have taken—and can continue to take—advantage of informal negotiation and dispute resolution to settle ACV concerns. Dkt. 59-1 at 22-23 (outlining the appraisal process); *see also* Ex. H, Walker Rpt. ¶¶ 37, 69; Ex. X, Hover Decl. ¶¶ 13, 17-27.

Further, any class would be unmanageable and unascertainable. Identifying class members would require resolving labor-intensive individualized questions. Plaintiff proposes no method for identifying which insureds are excluded from the class or lack standing due to reasons such as payment based on a different type of report; no payment due to withdrawal or coverage denial; negotiations; concessions; waiver of a deductible or condition adjustment greater than the PSA; lack of ownership, including through a lease, repossession, abandonment, or bankruptcy; or payments made by GAP insurers—even though these issues, or others like them, existed for at least 53 of the 150 sampled claims. *See* Ex. X, Hover Decl. ¶¶ 11-12, 16, 20-26, 29-37, 40-41, 43. Tanner is a prime example. Absent a full and thorough review of her file, it would not be apparent that her settlement was influenced by negotiation. Moreover, Tanner is a perfect example of why

Case 1:22-cv-00946-JMS-MKK    Document 108    Filed 10/24/23    Page 35 of 37 PageID
#: 3197


this class definition is "too vague or subjective" to satisfy the ascertainability standard. *Mullins v.*
*Direct Digital, LLC*, 795 F.3d 654, 647 (7th Cir. 2015). Although Tanner's payment was based on
negotiation, the negotiation resulted in a payment that was based, in part, on a WCTL report. The
adjuster took the WCTL report and manually stripped three of the low-value vehicles out. It is thus
entirely unclear whether an insured like Tanner would be in or out of the class—necessitating
endless inquiries into the class's scope.

Plaintiff suggests that the Court could just "look[] at individual Reports." Mot. 13. But
Plaintiff's expert testified that this will not work: an expert "would not be able to" identify all
members of the class by looking only at the data in Progressive's claim system and individual
WCTL valuation reports. Ex. Z, Lacey *Costello* Dep. Tr. 65:17-24; *see also* Ex. AA, Lacey
*Kroeger* Dep. Tr. 22:5-24, 43:10-46:24 (Dr. Lacey admitting that she did not look at the sample
reports produced in this case to determine which included a PSA or might be excluded from the
class for obvious reasons and conceding that the information given to her was inaccurate). As in
Tanner's case, even though a valuation report may have been generated, the ultimate settlement
may not have been based on the type of WCTL "Instant Report" at issue in this case. Ex. X, Hover
Decl. ¶¶ 12-27. This happened in at least 14 claims in the sample. *Id.* ¶¶ 12-26. The only way to
identify these, and other key issues, is by reviewing each claim file (or through testimony of each
putative class member). *Id.* ¶¶ 7-27. Collecting full claim files for nearly 60,000 insureds would
take a Progressive employee working full-time years to do. *Id.* ¶ 18. A class action process that
requires years of record collection alone is not a superior method of resolving disputes, especially
when the results of this process will raise as many questions about who is in the class as it answers.

## CONCLUSION

For these reasons, Plaintiff's motion for class certification should be denied.

Respectfully submitted this 20th day of October, 2023.

30

*/s/ Jeffrey S. Cashdan*
John Carl Trimble
Meghan Eileen Ruesch
Edmund L. Abel
**LEWIS WAGNER, LLP**
1411 Roosevelt Avenue, Suite 102
Indianapolis, IN 46201
Telephone: (317) 237-0500
Fax: (317) 630-2790
Email: jtrimble@lewiswagner.com
Email: mruesch@lewiswagner.com
Email: eabel@lewiswagner.com

Jeffrey S. Cashdan (admitted *pro hac vice*)
Zachary A. McEntyre (admitted *pro hac vice*)
J. Matthew Brigman (admitted *pro hac vice*)
Allison Hill White (admitted *pro hac vice*)
Erin M. Munger (admitted *pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Fax: (404) 572-5100
Email: jcashdan@kslaw.com
Email: zmcentyre@kslaw.com
Email: mbrigman@kslaw.com
Email: awhite@kslaw.com
Email: emunger@kslaw.com

Julia C. Barrett (admitted *pro hac vice*)
**KING & SPALDING LLP**
500 W. 2nd Street
Austin, Texas 78701
Telephone: (512) 457-2000
Fax: (512) 457-2100
Email: jbarrett@kslaw.com

*Counsel for Defendants*

31

**<u>CERTIFICATE OF SERVICE</u>**

I, Jeffrey S. Cashdan, hereby certify that on this date, October 20, 2023, I caused the

foregoing ***Defendants' Opposition to Plaintiff's Motion for Class Certification*** to be

electronically filed with the Clerk of the Court via the Court's CM/ECF system, which will provide

electronic mail notice to all counsel of record.

*/s/ Jeffrey S. Cashdan*
Jeffrey S. Cashdan
